JOHNSON, Senior Circuit Judge:
 

 This case arises on appeal following the district court’s denial of the Jacksonville Branch of the NAACP’s motion to change the method by which the Duval County School Board is implementing the consent agreement between the parties on reducing segregation in the county’s public schools. For the reasons that follow, we affirm the district court's decision in part, but remand several of the issues raised by the NAACP back to the district court for further consideration.
 

 I. STATEMENT OF THE CASE
 

 A.
 
 Factual Background
 

 In July 1990, after prolonged litigation over the desegregation of Duval County’s public school system,
 
 [1]
 
 the Jacksonville Branch of the NAACP (“the NAACP”) and the Duval County School Board (“the Board”) entered into a consent agreement entitled “Corrected Stipulation and Agreement” (“CSA”), terminating their latest round of litigation.
 
 [2]
 
 The CSA was designed to continue the Board’s desegregation process while allowing the Board and the community more flexibility in achieving integration. The primary method by which these objectives were to be achieved was through a rezoning of the county’s schools, supplemented by the creation of “magnet” programs at racially imbalanced schools.
 
 [3]
 
 In addition, the CSA contained a number of other provisions designed to ensure continued progress toward desegregation. The agreement prohibited the Board from guaranteeing students that they could attend their neighborhood schools, committed the Board to achieving racial balance in staff assignments, obligated the Board to guarantee free transportation to students attending magnet programs outside their zones, provided for the creation of a “facilities committee” to study each school’s educational programs and facility needs, and committed the Board to operating its programs “to achieve the maximum practicable desegregation.”
 

 Under the terms of the CSA, the Board was to begin implementation of the desegregation program in the 1991-92 school year. By June 1991, the NAACP claims that it realized that the Board’s system of implementation would significantly increase, rather than decrease, segregation in the county’s elementary schools and in some junior and senior high schools as well. Specifically, the NAACP alleges that
 
 *1577
 
 in early 1991, the Board sent each student a letter assigning the student to his or her nearest neighborhood school. According to the NAACP, the letter violated the CSA by in effect guaranteeing students the right to attend their nearest neighborhood school if they so chose. The NAACP claims that the letter is responsible for the Board’s surprisingly poor showing in its efforts to recruit students to the magnet programs in the 1991-92 school year. In addition, the NAACP claims that the Board violated the consent agreement by (1) failing to remedy racial imbalances in staff assignments, (2) informing black citizens that black children would not be offered free transportation to schools outside of their zone, and (3) prematurely disbanding the CSA’s “facilities committee” in November 1990.
 

 In response, the Board claims that it is making significant progress toward desegregation through its implementation of the plan, considering that it is recruiting for magnet programs with no proven track record. The Board also claims that it has significantly improved the racial balance in its staff assignments, and that the CSA in any event requires the parties to bargain before litigating over the achievement of racially balanced staffs. In addition, the Board argues that the NAACP has presented no reliable evidence that the Board intends to operate its free transportation policy in a discriminatory fashion. Finally, the Board claims that the clear terms of the agreement allowed it to disband the study committee in November 1990.
 

 B.
 
 Procedural History
 

 In June 1991, the NAACP filed a motion in the Middle District of Florida entitled, “Motion to Change the Method by Which Defendant Is Implementing the Corrected Stipulation and Agreement.” In its memorandum supporting the motion, the NAACP submitted figures showing that the 1991-92 enrollment in the Board’s elementary school magnet programs, and some of the county’s junior and senior high school magnet programs, were drastically below the estimates the Board had provided to the United States Department of Education earlier in the year.
 
 [4]
 
 The NAACP alleged, that the Board’s implementation would result in significant resegregation, particularly in the elementary schools, for the 1991-92 school year. To remedy this problem, the NAACP asked the district court to require the Board to implement a system of “controlled choice”
 
 [5]
 
 for the district’s elementary schools or, in the alternative, to stay any implementation measures until the Board showed that desegregation would be achieved through its implementation. In addition, the NAACP asked the court for equitable relief compelling Board compliance with the consent agreement’s provisions on staff assignments, free transportation, and the execution of the facilities committee’s functions.
 

 On August 5, 1991, the district court issued an order denying, the NAACP’s motion. The- district court found that the NAACP had failed to demonstrate that the Board’s proposed implementation of the
 
 *1578
 
 CSA would result in resegregation because the NAACP failed to submit overall attendance figures showing the estimated racial composition of each school for the 1991-92 school year.
 
 [6]
 
 The district court held that even if the NAACP could establish a re-segregative impact in the 1991-92 school year, the NAACP would not be entitled to relief “so long as the long-term desegrega-tive goals of the stipulation are being furthered.” The Court found that the Board’s implementation plan had not been given sufficient opportunity to work its intended purpose, and therefore the NAACP had not established sufficient grounds for modification of the consent agreement. The district court also held that none of the other alleged violations of the CSA entitled the NAACP to equitable relief.
 

 The district court’s findings and legal conclusions were based solely on the parties’ motions and briefs, without benefit of an evidentiary hearing. The NAACP now appeals the district court’s decision denying it relief, challenging both the factual findings and conclusions of law made by the district court.
 

 II. ANALYSIS
 

 For enforcement purposes, consent agreements are interpreted under the principles of contract law.
 
 See United States v. ITT Continental Baking Co.,
 
 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975);
 
 Paradise v. Prescott,
 
 767 F.2d 1514, 1525 (11th Cir.1985),
 
 aff'd,
 
 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987). Although a consent agreement may be enforced by judicial sanctions,
 
 see Paradise,
 
 767 F.2d at 1525, the obligations required of each party to a consent decree must be found “within its four corners, and not by reference to what might satisfy the purposes of one of the. parties to it.”
 
 United States v. Armour & Co.,
 
 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971). The NAACP charges that the district court erred in refusing to recognize at least four instances in which the Board violated its duties under the CSA. We will consider each alleged violation in turn, reviewing the district court’s interpretation of the consent agreement
 
 de novo,
 
 but accepting the district court’s factual findings unless they are shown to be clearly erroneous.
 
 See Turner v. Orr,
 
 759 F.2d 817, 821 (11th Cir.1985)
 
 (“Turner I”), cert. denied,
 
 478 U.S. 1020, 106 S.Ct. 3332, 92 L.Ed.2d 738 (1986),
 
 cf. Anderson v. City of Bessemer City,
 
 470 U.S. 564, 573-76, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518 (1985) (holding that clearly erroneous standard applies even when the district court’s findings are based solely on documentary evidence).
 

 After examining each of the alleged CSA violations, we will address the NAACP’s argument that the district court erred in denying its proposal to modify the consent decree. For the purposes of modification, consent decrees are not governed by contract law, but are treated as judicial acts, akin to injunctions.
 
 See United States v. Swift & Co.,
 
 286 U.S. 106, 114-15, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932);
 
 Williams v. Butz,
 
 843 F.2d 1335, 1337-38 (11th Cir.),
 
 cert. denied,
 
 488 U.S. 956, 109 S.Ct. 392, 102 L.Ed.2d 381 (1988). Therefore, the district court’s decision denying the NAACP’s request for a modification of the CSA is reviewable only for an abuse of discretion.
 
 See Wright v. Council of City of Emporia,
 
 407 U.S. 451, 470-71, 92 S.Ct. 2196, 2207, 33 L.Ed.2d 51 (1972).
 

 A.
 
 The Board’s “Neighborhood School ” Letter
 

 The NAACP argues that the Board violated the terms of the CSA by sending a letter to all elementary school students in early 1991 assigning each student, at least preliminarily, to his or her neighborhood school for the 1991-92 school year. The NAACP argues that this letter violated the Board’s duty under the consent agreement to “not guarantee to any student living in, or moving into, the assigned attendance area of such school that (s)he shall be assigned to or permitted to attend such school.” CSA, (I 14(c).
 

 
 *1579
 
 The district court held that although it found the possible existence of the letter “somewhat disturbing,” it did not constitute grounds for relief. In explaining its decision, the district court first noted that the NAACP did not submit a copy of the letter with its motion or supporting memorandum. Although we do not doubt the truth of this observation, it sheds no light on whether the court believed that such a letter was in fact sent to the district’s students. Because the Board did not specifically deny the existence of this letter,
 
 [7]
 
 the court could reasonably have found that the letter was sent even in the absence of a copy of the letter before it. We cannot meaningfully review the legal effect such a letter would have under the CSA without a factual finding in this regard.
 
 See Keefe v. Bahama Cruise Line, Inc.,
 
 867 F.2d 1318, 1322-23 (11th Cir.1989) (remanding case for additional fact-finding where the application of the legal standard required factual findings missing from the district court’s opinion);
 
 Hydrospace-Challenger, Inc. v. Tracor/Mas, Inc.,
 
 520 F.2d 1030, 1034 (5th Cir.1975) (factual findings must be stated with sufficient particularity to allow appellate court to determine rather than speculate that the law was applied correctly).
 

 The district court proceeded to base its denial of relief on that grounds that (1) it was “unclear whether such letter would violate the terms of the stipulation,” and (2) the district court presumed the Board would carry out the agreement in good faith. The district court is correct in concluding that it is “unclear whether such letter would violate the terms of the stipulation” in light of the district court’s failure to make any factual findings regarding the existence or contents of the letter. Whether the letter constituted a “guarantee,” and therefore a violation of the agreement, will of course depend on the precise language 0f the letter.
 
 Cf. Interstate Industries, Inc. v. Barclay Industries, Inc.,
 
 540 F.2d 868, 871-73 (7th Cir.1976) (considering whether letter constituted contract offer);
 
 Eulo v. Deval Aerodynamics, Inc.,
 
 430 F.2d 325, 327-28 (3d Cir.1970) (considering whether letter constituted a release of party’s contract obligations),
 
 cert. denied,
 
 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1971). This language must be established through factual findings which the district court declined to make. If the Board did in fact violate the agreement by issuing what was in effect a guarantee of neighborhood school attendance, the Board’s good faith is irrelevant.
 
 Newman v. Graddick,
 
 740 F.2d 1513, 1528 (11th Cir.1984). On the other hand, even if the letter (assuming it existed) did not guarantee children attendance at a particular school, the NAACP’s allegations about the contents of the letter, if proven, are sufficient to bring into question the Board’s good faith in carrying out its obligations under the CSA.
 
 See Illinois Corp. Travel, Inc. v. American Airlines, Inc.,
 
 682 F.Supp. 378, 380 (N.D.Ill.1988),
 
 aff'd,
 
 889 F.2d 751 (7th Cir.1989),
 
 cert. denied,
 
 495 U.S. 919, 110 S.Ct. 1948, 109 L.Ed.2d 311 (1990);
 
 Restatement (Second) of Contracts §
 
 205 (1981). We remand the issue of whether the Board violated the terms of the agreement by sending out such a letter for further proceedings. On remand, the NAACP should be given the opportunity to produce the letter, and the Board should be allowed to specifically respond to the NAACP’s charges that such a letter was mailed out to the district’s students.
 
 [8]
 

 
 *1580
 
 B.
 
 Staff Assignments
 

 The NAACP argues that the Board violated the CSA by failing to achieve compliance with court orders dating back to 1969 which require the Board to achieve a racial balance of 70% white staff and 30% black staff in each school.
 
 [9]
 

 See Mims v. Duval County School Bd.,
 
 329 F.Supp. 123, 128 (M.D.Fla.),
 
 aff'd,
 
 447 F.2d 1330 (5th Cir.1971);
 
 cf. Singleton v. Jackson Mun. Separate School Disk,
 
 419 F.2d 1211, 1218 (5th Cir.1969)
 
 (en banc), rev’d in part on other grounds,
 
 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 530 (1970). These court orders were incorporated by reference in CSA 1126, and by the district court in adopting the agreement. The district court held that the NAACP’s motion and memorandum failed to include evidentiary support for the staff assignment allegation. However, the NAACP submitted a statistical analysis of the expected racial composition of the Board’s staff assignments for the 1991-92 school year with its memorandum in support of its motion. According to these figures, apparently compiled by the Board itself, the Board did not expect to achieve full compliance with the court order on staff assignments by that time. Despite some improvement in staff ratios over the twenty years the Board has had to comply with this seemingly simple mandate, the figures indicate that 56 Duval County schools were not expected to be in compliance with the orders by the 1991-92 school year.
 
 [10]
 

 The Board’s failure to achieve a racial balance in its staff assignments even once in the more than twenty years it has been under court orders to achieve such a balance is of special concern to this Court. We have cited the Board’s failure to comply with the court orders on staff assignments as one of the major barriers to the Board’s achievement of unitary status.
 
 See NAACP I,
 
 883 F.2d at 952-53. However, the NAACP has brought this action under the CSA, and the Board’s duties for the purposes of this action must be found within the four corners of that agreement.
 
 See Armour,
 
 402 U.S. at 682, 91 S.Ct. at 1757. The CSA provides:
 

 The district shall report to plaintiff by March 1, 1991 the expected racial composition of the staff for each school for the 1991-92 school year and the parties then shall determine what, if any, additional steps the district shall undertake to comply with the existing court orders governing staff assignment.
 

 CSA, ¶ 26.
 

 This provision makes clear that for whatever reason, the parties contemplated that negotiation between the parties would precede any attempt to enforce the provisions requiring racial balance in the assignment of staff for the 1991-92 school year. The NAACP has not alleged that it ever attempted the course of action clearly mandated by the CSA — further negotiation. Therefore, the district court was correct in denying the NAACP equitable relief on its staff assignment claim at this time.
 
 See Securities and Exchange Comm’n v. Chenery Corp.,
 
 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943) (lower court must be affirmed if it reached the correct result). On remand, the NAACP must pursue its negotiation remedy before seeking enforcement of these provisions. Although this negotiation remedy must be exhausted, the Board should also be cautioned that the provisions in the prior court orders relating to racial balance in the staff are clearly
 
 *1581
 
 carried forward in the CSA and are subject' to court enforcement after exhaustion of the negotiation requirement.
 

 C.
 
 Student Transportation Policy
 

 In the district court proceedings, the NAACP submitted a letter dated May 17, 1991, from its counsel to the Board’s counsel alleging that a Linda Jones of the Board’s recruiting office told a meeting of black clergy that although white children would be given free transportation to attend secondary schools outside their district, black children would not be given the same free service to secondary schools. The letter asked the Board for clarification on the Board’s school transportation policy. The NAACP alleged that the Board failed to respond to its letter, and asked the district court to require the Board to clarify its transportation policy.
 

 The district court held that even if the hearsay statement was credited, there would be insufficient evidence to call the Board’s official transportation policy into question. The district court did not err in this regard. The NAACP presented no evidence showing the actual or apparent authority of Linda Jones to speak for the. Board regarding its official transportation policy.
 
 See Restatement (Second) of Agency
 
 § 27 (1958). Moreover, the record contains a letter dated June 3, 1991, from the Board to the NAACP clarifying the Board’s transportation policy. According to the letter, all students attending magnet schools or other schools identified in the attachments to the CSA would be provided with transportation. Therefore, the NAACP has already received the relief it is requesting.
 

 D.
 
 The Facilities Committee”
 

 Paragraph 24 of the CSA provides in relevant part:
 

 Should the district desire to open the other three newly constructed schools ... it shall: ...
 

 (c) by September 15,1990, convene a seven person committee to study
 
 facility needs and educational programs
 
 in the Duval County Public Schools as outlined in the agreement ....;
 

 (d) provide said committee staff support and resources necessary to produce a
 
 report on facilities needs
 
 in the core city by November 15, 1990, identifying those schools it believes need to be renovated; substantially rehabilitated and/or replaced;
 

 (e) agree to review the proposals of the facilities committee and determine by. January 15, 1991 which of its recommendations to adopt____
 

 CSA, ¶ 24 (emphasis added).
 

 After the parties entered into the agreement, the Board convened this so-called “facilities committee.” In November 1990, however, the Board ended its association with the committee and treated the committee as disbanded. The NAACP argues that because the agreement does not give a deadline for the completion of the committee’s study on educational programs, the committee was intended to be of permanent duration. Therefore, the Board is violating a continuing duty to accommodate the committee in its study of educational programs. The Board replies that the agreement anticipates the termination of the committee upon completion of its November report.
 
 [11]
 

 The district court concluded that the agreement road as a whole supported the conclusion that the committee was not permanent, but rather would cease to exist
 
 *1582
 
 once it completed its assigned duties. The district court pointed to terms of the CSA which do not appear to anticipate the committee’s further involvement with facility needs once it submitted its November 1990 report. Therefore, the district court denied the NAACP relief.
 

 We remand the committee, issue back to the district court for further consideration of the committee’s responsibilities with respect to its study of educational programs. The CSA unambiguously requires the committee to study both “educational programs” and “facility needs.” The November 15, 1990 deadline appears to apply only to the committee’s report and recommendations on facility needs.
 
 [12]
 
 Courts must try to give effect to each provision in a contract or consent agreement.
 
 See Roberts v. St. Regis Paper Co.,
 
 653 F.2d 166, 171 (5th Cir.1981). The CSA clearly anticipates that the committee would continue to exist until it completed both of its assigned functions. The district court on remand should determine the precise nature and duration of the committee’s duty to study educational programs, and make factual findings as to whether the committee ever fulfilled its duty to study the Board’s educational programs.
 

 E.
 
 Modification of the Consent Agreement
 

 Finally, the NAACP argues that the district court should have modified the consent agreement by restricting the Board’s freedom in its implementation of the plan to ensure significant progress toward desegregation in 1991-92 and beyond. The NAACP asked the district court to require the Board to implement a “controlled choice”
 
 [13]
 
 enrollment program for the elementary schools in the district. Alternatively, the NAACP sought to enjoin the Board from implementing its plan until the Board could show that its implementation would further desegregation.
 

 The district court unquestionably had the inherent power to grant a modification in the CSA.
 
 See United States v. Swift & Co.,
 
 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932);
 
 Hodge v. Department of Housing and Urban Development,
 
 862 F.2d 859, 861-62 (11th Cir.1989). Modification may be considered when (1) a significant change in facts or law warrants change and the proposed modification is suitably tailored to the change, (2) significant time has passed and the objectives of the original agreement have not been met, (3) continuance is no longer warranted, or (4) a continuation would be inequitable and each side has legitimate interests to be considered.
 
 Rufo v. Inmates of Suffolk County Jail,
 
 — U.S. —, —, 112 S.Ct. 748, 764, 116 L.Ed.2d 867 (1992);
 
 Newman,
 
 740 F.2d at 1520.
 

 Based on the evidence before it, the district court did not abuse its discretion in denying the NAACP’s request for modification. The NAACP has not yet demonstrated the existence of any of the situations in which modification might be warranted. As the district court noted, the Board’s implementation plan has not yet been given much of an opportunity to work for the CSA’s objectives. The NAACP filed suit for modification before the first year of implementation had even begun.
 
 Cf. United States v. United Shoe Machinery Corp.,
 
 391 U.S. 244, 251-52, 88 S.Ct. 1496, 1501, 20 L.Ed.2d 562 (1968) (modification permissible where consent decree has not achieved its purposes after 10 years of operation). Furthermore, because the NAACP did not submit either estimated or actual overall attendance figures for the elementary schools during the 1991-92 school year, the district court was not clearly erroneous in finding that the NAACP failed to demonstrate a resegrega-
 
 *1583
 
 tive effect of the Board’s implementation plan that might constitute a new and unforeseen condition justifying modification.
 
 [14]
 

 See Hodge,
 
 862 F.2d at 862 (before modifying a consent agreement in response to a change in circumstances, court “must be convinced by the party seeking relief that existing conditions differ so substantially from those which precipitated the decree as to warrant judicial adjustment”). Therefore, this Court will not disturb the district court’s denial of the NAACP’s request for modification at this time. However, should the NAACP demonstrate a resegregative impact in the Board’s implementation of CSA on remand, the district court will have the power to consider modification as a remedial measure.
 
 [15]
 

 IV. CONCLUSION
 

 For the foregoing reasons we VACATE and REMAND the district court’s order denying the NAACP relief for the Board’s alleged violations of the CSA for further consideration of (1) the letter that the NAACP alleges the Board sent district students assigning them to neighborhood schools, and (2) the nature and duration of the CSA committee’s duties regarding its study of educational programs. With regard to all other matters, we AFFIRM.
 

 [1]
 

 . The desegregation of Duval County’s schools has been an issue in federal court since I960. For a description of the course of events preceding this case, see
 
 Jacksonville Branch, NAACP v. Duval County School Bd.,
 
 883 F.2d 945, 947-50 (11th Cir.1989)
 
 (“NAACP I").
 

 [2]
 

 . The CSA was approved and adopted by the district court on July 13, 1990. The district court retained jurisdiction to enforce the agreement, to monitor the Board’s progress' in desegregating to achieve unitary status, and to take other measures as necessary to ensure the Board’s compliance with this Court’s opinion in
 
 NAACP I,
 
 883 F.2d at 945.
 

 [3]
 

 . The magnet programs were designed to attract a sufficient number of "opposite race students” from the community at large to integrate the enrollment of those schools in racially imbalanced zones.
 

 [4]
 

 . For example, among 56 elementary schools implementing magnet programs in 1990-91, 12 schools failed to enroll
 
 any
 
 students in their magnet programs, and 18 other schools attracted fewer than 15 students in each of their magnet programs. Only nine schools had more than 50 students enrolled in their magnet programs. The most successful elementary school attracted 161 students to its magnet math and science program. The next most successful elementary school attracted only 85 students to its performing arts magnet program. By comparison, the Board had estimated that enrollment in its magnet programs upon "full implementation" would exceed 200 students in each of nine elementary schools in the Duval County area. In some cases, the Board informed the Department of Education that it expected enrollments of 400, 600, 900, or even 1,094 students in particular elementary school magnet programs upon "full implementation."
 

 [5]
 

 . In the controlled choice program suggested by the NAACP, students would rank their top three choices for school attendance, including at least one school with a student body predominantly of the "other race.” The school board would then tabulate the responses to see if desegregation could be achieved by giving'all students their first choice of school assignments. If all the students’ first choices would not result in desegregation, the school board would randomly select students to attend their second or even third choice so that the desegregation goals of ■ the CSA would be met.
 

 [6]
 

 . The NAACP only submitted figures on each school's 1990-91 racial composition, and on the enrollment in each school’s magnet program for the 1991-92 school year.
 

 [7]
 

 . The Board argues that its general denial of "the allegations of paragraph 2 of the Motion” was sufficient to serve as a denial of the existence of the letter. Paragraph 2 of the NAACP’s motion alleged in general terms that the Board was causing resegregation and violating the terms of the CSA in its implementation. Allegations of the letter’s existence were first brought out in the NAACP’s memorandum in support of its motion. The Board did not address these allegations in its response. Therefore, it is unclear whether the Board denies the existence of the letter or if the Board does not believe the letter constituted a violation of the agreement.
 

 [8]
 

 . In its order, the district court also held that the letter was not sufficient to justify modification of the agreement. Because the NAACP has made its position clear that the letter constituted both a violation of the agreement and grounds . for modification, the letter need not justify modification of the agreement in order to entitle the NAACP to equitable relief.
 

 [9]
 

 . The original injunction allowed the Board to be deemed in compliance with the order when it achieved a staff balance within five percent above or below this numerical target.
 
 See ■ NAACP I,
 
 883 F.2d at 947-48. The Board has never achieved compliance with this order.
 
 See id.
 
 at 952.
 

 [10]
 

 . The Board argues that the 70% white and 30% black target ratio should now be adjusted to reflect county population shifts revealed in the 1990 census. The Board argues that the Duval County area now supports a population that is 76% white and 24% black; therefore, the required staff assignment ratio should be adjusted to 76% white and 24% black. The Board's argument misconstrues the original court injunction. The injunction, which is derived from the former Fifth Circuit’s opinion in
 
 Singleton,
 
 requires school systems to achieve a racial staff balance in each school equal to the ratio of white staff to black staff in the school system as a whole.
 
 See Singleton,
 
 419 F.2d at 1218;
 
 Mims,
 
 329 F.Supp. at 128.
 

 [11]
 

 . In the alternative, the Board argues that the NAACP is estopped from contradicting the Board’s interpretation of the agreement. The Board bases its estoppel claim on allegations that its chief negotiator told the members of the Board that the committee would end "after they make their recommendations" in a televised public meeting which was attended by representatives of the NAACP. The NAACP denies that it had any awareness of the Board’s purported interpretation of the committee provision until several months after the agreement was entered into. We are precluded from ruling on this argument because the district court did not make any factual finding that the Board had established the elements of its estoppel claim.
 
 See National Companies Health Ben. Plan v. St. Joseph's Hosp., 929
 
 F.2d 1558, 1572 (11th Cir.1991) (setting out elements of federal common law estoppel claim). The district court may address the Board’s estoppel argument on remand.
 

 [12]
 

 . The decision to set a deadline only for the facility needs study would be reasonable if the parties anticipated that facility needs would take longer to remedy than recommendations concerning the Board’s educational programs, thereby requiring a prompt report on facility needs so that its recommendations could be implemented by the 1991-92 school year.
 

 [13]
 

 .
 
 See supra
 
 note 5.
 

 [14]
 

 . The figures the NAACP submitted to the court established at most a lackluster performance of the Board’s magnet programs in their first year of performance. Although the NAACP’s proposal might achieve greater desegregation than the Board’s plan, the Board’s affirmative duty to further desegregation does not require it to adopt the most desegregative alternative available.
 
 See Lee v. Anniston City School Sys.,
 
 737 F.2d 952, 956 (11th Cir.1984). The CSA itself requires only that the Board operate its programs to achieve "the maximum
 
 practicable
 
 desegregation.”
 
 See
 
 CSA, ¶ 2 (emphasis added).
 

 [15]
 

 . Because the NAACP has not yet demonstrated a resegregative effect of the Board’s implementation, we need not reach the issue of whether some short-term resegregation would be permissible so long as the long-term desegregative goals of the CSA are furthered. However, we are disturbed by the district court’s holding to this effect. Any resegregative effects would cut at the heart of one of the basic purposes of the CSA.
 
 See Hodge,
 
 862 F.2d at 864;
 
 Williams v. Butz,
 
 843 F.2d 1335, 1338 (11th Cir.),
 
 cert. denied,
 
 488 U.S. 956, 109 S.Ct. 392, 102 L.Ed.2d 381 (1988).
 
 Cf. Wright v. Council of City of Emporia,
 
 407 U.S. 451, 462, 92 S.Ct. 2196, 2203, 33 L.Ed.2d 51 (1972) (in determining whether school district action should be allowed in non-unitary system, court’s focus should be on the effect of the school district’s action on dismantling the dual school systems rather than on the purpose of the school district in acting). Because the Board had not yet achieved unitary status at the time of the settlement agreement, and because prior court orders mandating desegregation were incorporated into the district court’s approval of the consent agreement, the Board remains under “an affirmative duty to eliminate the effects of its prior unconstitutional conduct.”
 
 Harris v. Crenshaw County Bd. of Education,
 
 968 F.2d 1090, 1094 (11th Cir.1992). Therefore, the CSA imposed an affirmative duty on the Board to act in a manner that would prevent a recurrence of the previous dual school system.
 
 Adams v. Board of Public Education,
 
 770 F.2d 1562, 1565 (11th Cir.1985). A showing that the Board was even temporarily moving back toward a dual system would appear to require at least a very strong showing of justification by the Board.
 
 See, e.g., Lee v. Macon County Bd. of Education,
 
 970 F.2d 767 (11th Cir.1992).