[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAR 29 2000
THOMAS K. KAHN
CLERK

No. 97-6347

D.C. Docket No. CV 85-T-665-N

JOHNNY REYNOLDS, individually on behalf of himself and as representative of a class of black employees of the Highway Department, State of Alabama, similarly situated,

Plaintiff-Appellee,

CECIL PARKER, ROBERT JOHNSON, et al.,

Intervenors-Plaintiffs-Appellees,

C. CAMPBELL WILSON,

Intervenor-Plaintiff,

WILLIAM ADAMS, CHERYL CAINE, et al.,

Intervenors-Plaintiffs-Appellants,

versus

G. M. ROBERTS, in his official capacity as Director for the Alabama Department of Transportation, et al.,

Defendants.

No. 98-6192

D.C. Docket No. 85-00665-CV-T-N

JOHNNY REYNOLDS, individually and on behalf of himself and as representative of a class of black employees of the Highway Department, State of Alabama, similarly situated,

Plaintiff-Appellee,

CECIL PARKER; ROBERT JOHNSON, et al.,

Intervenors-Plaintiffs-Appellees,

WILLIAM ADAMS, CHERYL CAINE, et al.,

Intervenors-Plaintiffs-Appellants,

versus

G.M. ROBERTS, in his official capacity as Director for the Alabama Department of Transportation, et al.,

Defendants-Appellees.

Appeals from the United States District Court
for the Middle District of Alabama

**(March 29, 2000)**

Before TJOFLAT and DUBINA, Circuit Judges, and STORY*, District Judge.

TJOFLAT, Circuit Judge:

These consolidated appeals arise out of a long-standing racial discrimination class action brought by African-American employees and job applicants against the Alabama Department of Transportation (the "Department"). Three years after the district court entered a race-neutral consent decree providing for prospective relief relating to job qualifications and promotion criteria, plaintiffs' counsel, using the class action as their vehicle, applied to the district court for preliminary and permanent injunctions prohibiting white employees of the Department from availing themselves of a race-neutral grievance procedure the parties had fashioned and the court had approved. The court granted counsel's application for a preliminary injunction, but, recognizing that the issuance of an order to show cause rather than an injunction is the appropriate device for enforcing a consent decree, denied counsel's application for a permanent injunction. In the same stroke, the court, intent on granting counsel the relief they sought, transformed their application for a permanent injunction into an application for a declaratory judgment, declaring that allowing non-black employees to use the race-neutral grievance procedure violates the consent decree. Reynolds v. Alabama Dep't of Transp., 996 F. Supp. 1130 (M.D. Ala. 1998). In No. 97-6347, a class of intervenors, who consist of the Department's

_____
*Honorable Richard W. Story, U.S. District Judge for the Northern District of Georgia, sitting by designation.

3

non-black employees (the "Adams Intervenors"), appeals the preliminary injunction. In No. 98-6192, the same class appeals the declaratory judgment. We vacate both orders and instruct the district court to restore the status quo ante.

I.

A.

The procedural history of this case is set out in our opinion in Reynolds v. Roberts, 202 F.3d 1303, 1305-11 (11th Cir. 2000) (Reynolds I). Here, we recite a shortened version of that history and then focus on the events relevant to this appeal.

The named plaintiffs brought this suit against the Department[1] in May 1985 on behalf of all black employees and former employees of the Department and all unsuccessful black applicants for positions within the Department. Alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17, 42 U.S.C. § 1981, and the Equal Protection Clause of the Fourteenth Amendment, plaintiffs sought monetary and injunctive relief under

---

[1] In addition to the Department, the plaintiffs sued various state officials. The lawsuit was styled initially as Reynolds v. King. It became Reynolds v. Roberts, then Reynolds v. Alabama Department of Transportation. The case came to this court styled Reynolds v. Butts; Butts was the director of the Department when the Adams Intervenors took this appeal. He was replaced as director by G.M. Roberts. We refer to the defendants in this case collectively as the Department.

those statutes and under 42 U.S.C. § 1983. In October 1986, the court certified three plaintiff classes.[2]

After the parties joined issue, and engaged in discovery, they entered into settlement negotiations. In 1988, and again in 1991, they presented a proposed consent decree to the district court for approval. On each occasion, some members of the plaintiff classes objected to the entry of the decree; the district court sustained their objections and refused to enter the decree.

In June 1992, the case proceeded to trial before the court. Near the end of the plaintiffs' case, the parties asked the court to recess the proceeding indefinitely so they could engage in further settlement negotiations. The court granted their request. In November 1993, the parties reached a partial settlement, in the form of a proposed consent decree. The proposed decree provided a range of prospective class-wide injunctive relief. Among other things, it set hiring and promotion quotas for blacks – 33% of the positions in each job classification in the Department would be set aside for blacks. To ensure an adequate pool for this set-

---

[2] The first class consisted of any black person who unsuccessfully applied for a merit position in the Department at any time after May 21, 1979. The second class included all blacks employed by the Department at any time after May 21, 1979, who were permanent employees under the Department's merit system (the "merit" employees) and therefore eligible for, but had been denied, promotion. The third class consisted of a portion of the blacks employed by the Department at any time after May 21, 1979, as temporary employees (the "non-merit" employees). During their employment in the Department, these employees had applied for, but had been denied, merit positions.

aside program, the decree directed the Department to mount an aggressive recruiting campaign at historically black colleges and universities. Finally, the decree required the Department to establish a grievance procedure for its employees.

The parties presented the proposed decree to the district court, which, in turn, scheduled a hearing for January 19, 1994, to entertain any objections members of the plaintiff classes, or others likely to be affected (like white employees of the Department), might have to the terms of the proposed decree. On January 13, a group of white Department employees (the "Adams Intervenors") moved the court for leave to intervene on behalf of the Department's non-black employees in order to challenge the race-conscious provisions of the proposed decree – specifically, the 33% quota requirement for all job classifications in the Department. The court granted the motion, Reynolds v. Roberts, 846 F. Supp. 948, 953-54 (M.D. Ala. 1994), and subsequently certified an additional class, consisting of the Department's non-black employees.

The January 19 hearing was held as scheduled. Over 200 people attended the hearing, including many non-black employees of the Department. The objections to the race-conscious aspects of the proposed consent decree were such that the parties withdrew it and, with leave of court, went back to the drawing

6

board. By late February 1994, the plaintiffs and the Department decided to divide the previously proposed decree into three parts, called Consent Decrees I, II, and III. Consent Decree I contained the provisions that all sides agreed provided only race-neutral prospective relief. Consent Decrees II and III contained provisions that were acceptable to the plaintiffs and the Department, but opposed as race-conscious by the Adams Intervenors.

The parties submitted Consent Decree I to the district court for approval, and, on March 7, the court held a hearing on the fairness of the proposal. No one other than the parties' attorneys appeared at the hearing, and no one objected to the entry of the decree. The court approved the decree and, by order entered March 16, 1994, adopted it in full.

## B.

Consent Decree I is composed of a series of "Articles" which revamped the process by which the Department hires, promotes, classifies, and pays its employees. The decree abolished the system of "employment registers" from which positions were filled and promotions were granted, and created new qualifications and procedures for hiring and promotion. It also created new procedures for, among other things, rotation of job duties, recruitment, and

training.  None of the Articles of Consent Decree I provide special benefits or procedures for black employees of the Department.

The only Articles relevant to this appeal are Article 15 and one provision of Article 19.  Article 15 required the Department to conduct a study of all its employees (regardless of race) to determine if any employees were being assigned duties associated with a higher job classification (and thus higher pay level) than the one they currently had.  If the study uncovered an employee "spending a majority of [his or her] working time in the performance of the duties and responsibilities of a higher job classification," the Department was required to reclassify the employee at the higher level (and therefore increase that employee's salary).  Article 15 also required the Department "to monitor the duties and responsibilities performed by employees with the goal of assuring to the extent practicable that at least 90% of the duties and responsibilities performed by employees on a regular or non-emergency basis are within the job description for [the] job they are holding."

To ensure that the Department was fulfilling Article 15's obligations (as well as other obligations) under Consent Decree I, Article 19 mandated the creation of a grievance[3] procedure that individual employees could use:

> Within 180 days of the effective date of this Decree, the Highway Department will develop and implement an enhanced complaint procedure which assures that all discrimination complaints are processed without fear and reprisal within established time limits and that appropriate action is taken following [the resolution of a complaint]. Such procedure will be submitted to plaintiffs' counsel for review and comment at least 30 days prior to its implementation.

The Department complied with this mandate and submitted a proposed complaint procedure, designated the "Revised Complaint Procedure," to plaintiffs' counsel for review. Plaintiffs' counsel approved the procedure. Although Article 19 did not require it to do so, the Department submitted the procedure to the district court. On August 9, 1995, the court incorporated the procedure in an "Order and Injunction."[4]

---

[3] Both Consent Decree I and the Revised Complaint Procedure use the words "grievance" and "complaint" interchangeably. Throughout this opinion we use the term "grievance." We use the term "grievant," as did the district court, to refer to an employee who has filed a grievance under the procedure.

[4] In its order, the court stated that "[c]ounsel for the plaintiffs have informed us that they agree to [the proposed grievance procedure]." We therefore assume that the Department "submitted [it] to plaintiffs' counsel for review and comment at least 30 days prior to its implementation," as required by Article 19.

The court did not indicate, in its order, whether counsel for the Adams Intervenors had agreed to the procedure. The record does not reveal any contemporaneous objection by the Adams Intervenors. On appeal, the Adams Intervenors do not challenge the grievance procedure itself, only the district court's subsequent action precluding non-black employees from utilizing it.

The grievance procedure is race-neutral. It opens by stating that "[t]he Consent Decree and Departmental policy mandate that all employees enjoy a workplace free from discrimination." The procedure allows a grievance to be filed for any "alleged wrong based upon the employee's race, color, creed, sex, national origin, age, or handicap." Moreover, it allows grievances for "a violation of the Consent Decree, or arising from matters that are the subject of the Consent Decree." The procedure is available to the Department's employees without regard to race.[5]

The grievance procedure consists of four steps. In step one, a grievance is submitted to an employee's immediate supervisor. The supervisor responds in writing with a proposed resolution, which may or may not be accepted by the grievant. If the grievance cannot be resolved, it is submitted in step two to the Department's appointed Equal Employment Opportunity ("EEO") Monitor, who also proposes a solution. If the grievant finds the solution unacceptable, the process moves to step three. Step three is a formal hearing within the Department,

---

[5] The Revised Complaint Procedure is also available to "any . . . employee who has been terminated . . . or applicant for full-time employment." The complaint procedure, however, provides no mechanism for a former employee or applicant to file a grievance. Rather, the mechanism that is provided applies only to current employees.

conducted by the Department's "Hearing Officer."[6]  If the matter is still not

resolved, then, at step four, either party may seek arbitration before "an external

arbitrator . . . selected from a panel of Seven (7) arbitrators, with Three (3) of such

panel members to be designated by class counsel, Three (3) to be designated by the

Department, and One (1) to be designated by agreement among the other Six."  An

employee with a grievance is not required to invoke the Revised Complaint

Procedure; as the procedure states, an employee may file an "administrative charge

or separate legal action" instead.[7]

## C.

As noted, Consent Decree I requires the Department, "to the extent

practicable," to assure that employees are performing the duties within their job

---

[6] A Hearing Officer is taken in sequence from a list of Hearing Officers agreed to by both the Department and plaintiffs' counsel.

[7] In regards to the external arbitration at step four, the grievance procedure states:
> The findings and orders of the arbitrator shall be final from which no appeal may be taken in the context of the Reynolds case.  Nothing in this procedure, however, shall be construed to prevent the filing of any administrative charge or separate legal action.  In the event that class counsel deems the outcome of the arbitration to constitute a violation of Consent Decree I, class counsel may file a motion . . . for relief [with] the Court.

The record does not indicate how the parties or the court believed the first sentence of the above provision, which allows "no appeal," to be consistent with the third sentence, allowing "class counsel" to "file a motion . . . for relief [with] the Court" whenever "class counsel deems the outcome of the arbitration to constitute a violation of Consent Decree I."

classification and are not being assigned extra duties without compensation. By 1996, a number of black employees of the Department had filed grievances alleging that the Department had assigned them out-of-classification duties. They sought back pay and/or a "provisional appointment"[8] to the position whose duties they were actually performing. At least two of these grievances eventually made their way to the district court for a ruling,[9] and, in both, the court ordered back pay and issued an injunction mandating a provisional appointment for the employee. In neither of these grievances did the district court make a finding that the grievant had been the victim of discrimination – the court only found that they had been performing duties outside their job classification, in violation of Article 15.[10]

---

[8] As best we can discern from the record, a "provisional appointment" is simply a temporary promotion to a higher job classification. The provisional appointment apparently expires when the higher position is permanently filled through the competitive selection procedures mandated by Consent Decree I.

[9] These grievances of black employees came before the court in the following manner. The original Complaint Procedure negotiated between the parties (but not presented to the district court for approval) allowed any dissatisfied grievant to file a separate motion for relief with the district court. The grievances of the black employees described in the text were brought before the district court pursuant to this procedure; the district court appointed a special master to take evidence and issue recommendations. At the same time, the court stated that it would not continue to be what it described as a "super personnel board" and instructed the parties to revise the Complaint Procedure to "remove the court from the process." Reynolds, 996 F. Supp. at 1144 n.40. This resulted in the parties negotiating the Revised Complaint Procedure and submitting it to the district court for approval. See id. As this appeal indicates, the district court was unsuccessful in "remov[ing itself] from the process." Id.

[10] One of the district court's injunctive orders awarding a provisional appointment and back pay to a black grievant indicates that the Department opposed the award because the grievant had not proven that he had been assigned work out-of-classification because of his race. The district court

12

In late 1996, three white employees of the Department ("the white grievants") filed grievances alleging that they too had been assigned duties outside their classification in violation of Article 15.[11] They sought back pay and provisional appointments. The employees' supervisor (all three apparently had the same supervisor) did not provide a satisfactory resolution, and a single hearing for all three grievants was held before the Department's EEO Monitor. The EEO Monitor recommended back pay and provisional appointments for all three, a resolution which was accepted by the white grievants.

## D.

On February 26, 1997, counsel for the three plaintiff classes ("plaintiffs' counsel") moved the district court for a temporary restraining order ("TRO") to prevent the Department from implementing the three grievance resolutions.[12] They

---

dismissed the Department's position: "[A black grievant] has no obligation to show that the [D]epartment acted in a discriminatory manner, only that they failed to conform to the decree."

[11] The white grievants did not allege that they had been assigned duties outside their classification because of their race.

[12] As explained supra note 2, the plaintiff classes were made up of (1) unsuccessful applicants for merit positions with the Department, (2) merit employees who had been denied promotion(s) in the Department, and (3) non-merit employees who had been denied merit positions. The second and third classes included both former and current employees of the Department.

It is obvious that the Department's Revised Complaint Procedure is inapplicable to the first plaintiff class and to the former employees in the second and third plaintiff classes. See supra n.5 and accompanying text. The procedure applies, instead, to current employees in the second and

13

alleged that, if the EEO Monitor's resolution of the grievances were implemented, the Department would be violating Consent Decree I. The next day, the court conferred with plaintiffs' counsel and the Department's attorneys by telephone;[13] later that day, it issued a TRO which enjoined the Department from implementing the three grievance resolutions. On March 10, plaintiffs' counsel applied for a preliminary injunction and asked the court to extend the TRO until their application could be heard. After another telephone conference with the attorneys, the court extended the TRO and scheduled a hearing for March 24 on the application for a preliminary injunction.[14]

The hearing was held as scheduled. On April 9, 1997, the court "preliminarily ENJOINED and RESTRAINED" the Department and its agents "from provisionally appointing, promoting or paying backpay to [the three white

---

third classes and, of course, to the Department's future employees.

Accordingly, when plaintiffs' counsel applied to the district court for the preliminary and permanent injunctive relief involved in this appeal (although they did not indicate as much), they were not representing members of the first plaintiff class or former employees in the second and third plaintiff classes.

[13] There is no indication in the record that the three white grievants were notified of plaintiffs' counsel's application for a TRO or that they were represented by counsel in the telephone conference with the court. Accordingly, the TRO issued without notice to these grievants. See Fed. R. Civ. P. 65(b). The record indicates that counsel for the Adams Intervenors participated in all subsequent hearings on plaintiffs' counsel's applications for injunctive relief (relating to the Revised Complaint Procedure) and acted as counsel for the three white grievants – just as they have in these appeals.

[14] The extended TRO would expire on March 24.

14

grievants]." The Adams Intervenors timely appealed from this preliminary injunction, No. 97-6347.

On March 28, before the court had ruled on the application for a preliminary injunction, plaintiffs' counsel applied for a second preliminary injunction; this time, they asked the court to prevent the Department from processing any grievances by non-black employees. Counsel alleged that allowing any non-blacks to utilize the grievance procedure would violate Consent Decree I. The court treated counsel's application as one for a permanent injunction and held hearings in late April 1997. Eleven months later, on March 3, 1998, while the Adams Intervenors' appeal of the April 9 preliminary injunction was pending in this court, the district court, in a memorandum order, ruled on counsel's application. See Reynolds, 996 F. Supp. 1130.[15]

In its March 3, 1998, order, the court did not grant plaintiffs' counsel a permanent injunction; instead, acting sua sponte, it gave them declaratory relief.[16] It stated that allowing non-class members to file grievances would be "a tool to allow supervisors again to engage in the secretive and non-competitive selection

---

[15] As far as we can tell from the record, the district court did not vacate the preliminary injunction enjoining the Department from implementing the EEO Monitor's resolutions of the white employees' grievances; we assume, therefore, that the preliminary injunction remains in effect against the Department.

[16] In none of plaintiffs' motions for injunctive relief did they ask for declaratory relief.

15

and promotion of employees." Id. at 1132. The court worried that an employee and supervisor would collude to circumvent the competitive system for employment contemplated by the consent decree: the employee, under the direction of his supervisor, would file a fake "grievance," which would result in the supervisor awarding a provisional appointment and back pay. Id. at 1139. Despite this concern, the court concluded that issuing an order enjoining the Department from hearing grievances of non-blacks would be inappropriate. It reached this conclusion because, in Newman v. Alabama, 683 F.2d 1312, 1318 (11th Cir. 1982), we instructed that consent decrees, like all injunctions, are to be enforced through the district court's civil contempt power – exercised after (1) the plaintiff moves the court to order the defendant to show cause why he should not be held in contempt for refusing to obey the decree's mandate, (2) the court grants the motion, and (3) the defendant fails to present a lawful excuse for his alleged disobedience – and plaintiffs' counsel had not invoked the court's enforcement power in this manner. Notwithstanding plaintiffs' counsel's failure to move the court for an order to show cause why the Department should not be adjudged in contempt for refusing to comply with the Consent Decree I, the court treated counsel as though they had done so – except that instead of entering a permanent injunction against the Department, it entered a declaratory judgment, which (we

16

presume) it fully expected the Department to treat as an injunction.[17] The court

stated that "the plaintiffs' motions for permanent injunctions . . . are granted to the

extent that it is declared as follows: Provisionally appointing, promoting, or paying

backpay to [the three white grievants] pursuant to the grievances they filed would

violate the consent decree."[18] Reynolds, 996 F. Supp. at 1156.

The Adams Intervenors appealed this declaratory judgment, No. 98-6192.

We consolidated the appeal with their appeal of the preliminary injunction, No. 97-

6347. We now vacate both judgments.


II.

---

[17] We have no doubt that the Department would treat the declaratory judgment as an injunction, since the declaratory judgment would appear to foreordain the outcome of a hearing requiring the Department to show cause why it should not be held in contempt for allowing non-black employees to invoke the grievance procedure.

[18] As we explain in the text infra, the district court had no basis for nullifying the EEO Monitor's resolutions of the three white's grievances; nothing in the record even remotely suggested that the EEO Monitor's resolutions somehow discriminated against a member of any of the plaintiff classes. The court's only reason for entering the judgment was to alleviate its concern that, at some unforeseen time in the future, the Department might use the grievance procedure to reinstitute its racially discriminatory practices. In sum, if the EEO Monitor's resolutions of the three white's grievances did not discriminate against a member of a plaintiff class, but the court nonetheless felt constrained to nullify the resolutions as violative of Consent Decree I, it follows inexorably that, in the court's view, allowing any non-black to invoke the grievance procedure – even if it caused a plaintiff class member no injury – would violate the decree. We therefore treat the declaratory judgment as amending the Revised Complaint Procedure so that it applies only to blacks. We assume that, if a non-black employee has a grievance, he or she should resort not to the Revised Complaint Procedure, but to whatever alternative procedure the Department may have devised for the purpose of entertaining the grievance.

Before we consider the merits of the Adams Intervenors' appeals, we think it appropriate to reiterate what we have said in the past as to how injunctions, including consent decrees, are to be enforced. They are enforced through the trial court's civil contempt power. See In re Grand Jury Proceedings, 142 F.3d 1416, 1424 (11th Cir. 1998) (injunction); Newman, 683 F.2d at 1317-19 (consent decree). If the plaintiff (the party obtaining the writ) believes that the defendant (the enjoined party) is failing to comply with the decree's mandate, the plaintiff moves the court to issue an order to show cause why the defendant should not be adjudged in civil contempt and sanctioned. See Newman, 683 F.2d at 1318; see also Thomason v. Russell Corp., 132 F.3d 632, 634 n.4 (11th Cir. 1998); Wyatt v. Rogers, 92 F.3d 1074, 1078 n.8 (11th Cir. 1996). The plaintiff's motion cites the injunctive provision at issue and alleges that the defendant has refused to obey its mandate. See Wyatt, 92 F.3d at 1078 n.8. If satisfied that the plaintiff's motion states a case of non-compliance, the court orders the defendant to show cause why he should not be held in contempt and schedules a hearing for that purpose.[19] At the hearing, if the plaintiff proves what he has alleged in his motion for an order to show cause, the court hears from the defendant. At the end of the day, the court

---

[19] The court's show cause order may instruct the defendant to file a response; depending on what the defendant says in his response, a hearing may be unnecessary.

18

determines whether the defendant has complied with the injunctive provision at issue and, if not, the sanction(s) necessary to ensure compliance. See Newman, 683 F.2d at 1318.

As the district court appropriately recognized in its March 3, 1998, order granting a declaratory judgment, plaintiffs' counsel did not invoke this time-honored procedure to obtain enforcement of any of the provisions of Consent Decree I or the Order and Injunction, which amended Consent Decree I by approving the Revised Complaint Procedure. The reason why plaintiffs' counsel did not move the court for an order to show cause is obvious: the Department had not disobeyed any of the mandates of the consent decree, as amended, and plaintiffs' counsel could not contend that it had without running afoul of Rule 11 of the Federal Rules of Civil Procedure.[20] What the Department had done was to permit three white employees to invoke the race-neutral grievance procedure (provided by the Revised Complaint Procedure), and, then, to accept the EEO Monitor's resolutions of the grievances. Instead of seeking enforcement of the

---

[20] Rule 11 states, in pertinent part:
> By presenting to the court . . . a pleading . . . an attorney . . . is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law . . . [and] the allegations and other factual contentions have evidentiary support . . . .

19

consent decree, as amended, through the district court's contempt power, plaintiffs'
counsel took another approach, in two steps.

First, they moved the court to prevent the Department from implementing
the EEO Monitor's resolutions by entering a TRO and then a preliminary
injunction. Second, they moved the court permanently to enjoin the Department
from allowing any non-black employee to invoke the grievance procedure. The
district court entered the TRO and preliminary injunction counsel requested.
Eleven months later, the court transformed counsel's application for a permanent
injunction into a request for declaratory relief and granted a declaratory judgment.
We turn now to the merits of the Adams Intervenors' appeals, beginning with their
appeal of the preliminary injunction.

A.

We do not tarry long in concluding that the district court erred in entering
the preliminary injunction barring the Department from implementing the EEO
Monitor's resolutions of the white employees' grievances. A court enters a
preliminary injunction to prevent the plaintiff from being injured, and where there
is no adequate remedy at law. See Beacon Theatres, Inc. v. Westover, 359 U.S.
500, 506-07, 79 S. Ct. 948, 954, 3 L. Ed. 2d 988 (1959). In this case, the

Monitor's resolutions injured no member of a plaintiff class on account of race or in any other way. Had injury occurred in violation of any of the civil rights laws or the Equal Protection Clause of the Fourteenth Amendment, a class member could have filed an independent lawsuit, in state or federal court, and sought legal or equitable relief, or both. But, because no class member suffered injury, plaintiffs' counsel were proceeding strictly on their own. That is, although they appeared to be representing the plaintiff classes, they were actually representing no one but themselves – bent on preventing the three white grievants from obtaining provisional appointments and back pay. They proceeded as if the white grievants had done something unlawful by invoking the race-neutral complaint procedure.

Because they had suffered no injury that would warrant relief, legal or equitable, plaintiffs' counsel lacked standing to prosecute their application for a preliminary injunction. Moreover, by using the Reynolds case as a vehicle to prosecute their application, they abused the judicial process. And the abuse was as gross as any we have encountered. As we detail in the margin,[21] counsel not only

[21] After plaintiffs' counsel filed their motion for preliminary injunction to prevent the Department from implementing the EEO Monitor's resolutions, the attorneys for the Adams Intervenors moved the court to allow the three white grievants to intervene as individuals in order to represent their interests. At the March 24, 1997, hearing on plaintiffs' counsel's application for a preliminary injunction, plaintiffs' counsel objected to a separate intervention by these white grievants, stating, "Intervention is not necessary to bind these parties to an injunction. To allow further white employees to come into the case at will at this late date is not proper." The court stated it would "take the motion [to intervene] under submission. Since it appears that the movants . . . are

failed to join the three white grievants as defendants, they vigorously opposed their efforts to intervene.

There is no need to say more. The district court's preliminary injunction is vacated, and we instruct the court to strike from the record plaintiffs' counsel's application for injunctive relief barring the Department from implementing the EEO Monitor's resolutions of the three white employees' grievances.

## B.

We address the merits of the Adams Intervenors' appeal of the declaratory judgment by making a few observations that can hardly be disputed. First, Consent Decree I provides race-neutral prospective relief, and that is all. Second, Article 19 required the Department to draft a procedure for ensuring that employees could complain about such things as improper job classification and pay "without fear and reprisal" and to submit the procedure to "plaintiffs' counsel for review and

---

represented by the same lawyer [as the Adams Intervenors], I don't see any need to resolve that right now."

The district court entered the preliminary injunction on April 9, without ruling on the motion to intervene. The Adams Intervenors filed their notice of appeal on behalf of the class and on behalf of the white grievants as "proposed-intervenors."

Two months later, the Adams Intervenors, in their brief in opposition to plaintiffs' counsel's motion for a permanent injunction, argued in support of their motion to allow the three white grievants to intervene. Neither plaintiffs' counsel nor the Department responded to the arguments.

As far as we can tell from the record, the district court has never ruled on the white grievants' motion to intervene. Under the circumstances, for purposes of this appeal we treat the three white grievants as part of the class represented by the Adams Intervenors.

22

comment." The Department drafted a procedure, the "Revised Complaint Procedure," and submitted it to plaintiffs' counsel as Article 19 required. The draft was, as indicated supra, entirely neutral with respect to "race, color, creed, sex, national origin, age, or handicap," meaning that the procedure would be made available to everyone, including a non-black. Third, plaintiffs' counsel approved the draft. See supra n.4. Fourth, although Article 19 did not require court approval, the draft was submitted to the district court. Fifth, the court approved the draft, and thus made it an amendment to Consent Decree I.

To say that the Revised Complaint Procedure somehow "violates" Consent Decree I, as plaintiffs' counsel contended in their application for a permanent injunction (barring non-blacks from invoking it) is more than sophistic; it is preposterous. So, why did plaintiffs' counsel file their application for a permanent injunction which would limit the protection afforded by the complaint procedure to blacks only? Because they thought they had made a bad bargain, and they wanted to undo it. But, instead of asking the court to void the contract, however, for mutual mistake of fact or some other legally-recognized ground for vitiating contracts[22] (which would have been the professional thing to do, assuming that

---

[22] Consent decrees are construed according to accepted contract principles. See Reynolds I, 202 F.3d at 1312-13. We note, however, that "[f]or the purposes of modification, consent decrees are not governed by contract law, but are treated as judicial acts, akin to injunctions." Jacksonville Branch, NAACP v. Duval County Sch. Bd., 978 F.2d 1574, 1578 (11th Cir. 1992).

23

they could satisfy Rule 11's ethical/professional standard), plaintiffs' counsel claimed that the revised procedure "violated" Consent Decree I. The district court should have given plaintiffs' claim short shrift and rejected out of hand their application for a permanent injunction. The court recognized that an application for injunctive relief is an inappropriate device for enforcing a consent decree, so it sua sponte transformed the application into an application for a declaratory judgment. Apparently, the court failed to realize that "that dog won't hunt," Elrod v. Sears, Roebuck, and Co., 939 F.2d 1466, 1471 n.3 (11th Cir. 1991), and that it was entering a judgment that could not withstand appellate review.

It is evident, from what transpired in the district court in this case, that counsel and the court need to be reminded of two things. First, "[l]ong standing precedent evinces a strong public policy against judicial rewriting of consent decrees. '[A] district court may not impose obligations on a party that are not unambiguously mandated by the decree itself.' King v. Allied Vision, Ltd., 65 F.3d 1051, 1058 (2d Cir. 1995)." Reynolds I, 202 F.3d at 1312. Consent decrees are contracts, and we construe them using the normal tools for interpreting contracts. See id. at 1312-13. Where they are unambiguous, the court must uphold a decree as written. In this case, the contract – the Revised Complaint Procedure –

24

is unambiguous.[23]  Moreover, although it was drafted by the Department's attorneys, it was approved by the plaintiff classes' highly sophisticated attorneys.[24]  Accordingly, the district court had no basis in law for rewriting the contract, which it had approved, so that the Revised Complaint Procedure would be available only to blacks.

Second, if in the future a black employee – or <u>any</u> employee, for that matter – suffers racial discrimination in the work place, the employee's remedy (if the grievance cannot be resolved) will be to seek relief in a <u>separate</u> lawsuit, brought in state or federal court.  If brought in the United States District Court for the Middle District of Alabama, the suit will be assigned to a district judge under the court's

---

[23]  Because Consent Decree I and the Revised Complaint Procedure amendment are unambiguous, the district court erred when, in determining whether the amendment violated the decree, it considered evidence that the plaintiff classes had introduced at the trial of the case, which was aborted before plaintiffs rested, and testimony given at the March 24, 1997, hearing on plaintiffs' counsel's application for a preliminary injunction (barring the Department from implementing the EEO Monitor's resolutions of the white employees' grievances).  <u>See</u> <u>Reynolds</u>, 996 F. Supp. at 1134-36, 1139-42.

[24]  We take judicial notice that plaintiffs' counsel have a wealth of experience in the courts of this circuit and are surely aware of the legal consequences of entering into contracts and consent decrees.  <u>See, e.g.</u>, <u>Riddle v. Cerro Wire & Cable Group, Inc.</u>, 902 F.2d 918 (11th Cir. 1990); <u>Holmes v. Continental Can Co.</u>, 706 F.2d 1144 (11th Cir. 1983).

25

random assignment system. In other words, the suit will not be made a part of the Reynolds litigation.[25]

In sum, in No. 98-6192, the district court's declaratory judgment is vacated, and we instruct the district court to strike from the record plaintiffs' counsel's application for permanent injunctive relief barring the Department from making the Revised Complaint Procedure available to non-blacks.

### III.

In No. 97-6347, plaintiffs' counsel invited the error the district court committed when it entered the preliminary injunction barring the Department from affording the three white grievants the provisional appointments and back pay the EEO Monitor awarded to them. In addition to inviting the error, plaintiffs' counsel have attempted to defend the district court's ruling on appeal with baseless

---

[25] We issue this directive in the exercise of our supervisory power after considering the history of this litigation. See 28 U.S.C. § 2106 (1994) ("[A] court of appellate jurisdiction may . . . require such further proceedings to be had as may be just under the circumstances."). See generally Piambino v. Bailey, 757 F.2d 1112, 1145-46 (11th Cir. 1985) ("Despite the wide variety of situations in which supervisory power has been invoked, the objective behind its use – fashioning procedures and remedies that ensure that the judicial process remains a fair one – has not varied."). See also Smith v. Mulvaney, 827 F.2d 558, 562-63 (9th Cir. 1987); United States v. Baylin, 696 F.2d 1030, 1043 n.30 (3d Cir. 1982).

arguments.  We have considered whether we have the authority under Rule 38 of the Federal Rules of Appellate Procedure to award the Adams Intervenors "just damages and single or double costs," but we conclude that the rule, as written, precludes such an award to the appellant.[26]  We have also considered whether we have the authority under 28 U.S.C. § 1927 (1994) to award these intervenors "excess costs, expenses, and attorneys' fees reasonably incurred" because of counsel's conduct.  The courts of appeals have section 1927 authority.  See, e.g., T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 638 (9th Cir. 1987); Olympia Co., Inc. v. Celotex Corp., 771 F.2d 888, 893-94 (5th Cir. 1985).  Counsel subject to section 1927 sanctions are entitled to be heard regarding the matter, see Braley v. Campbell, 832 F.2d 1504, 1514-15 (10th Cir. 1987) (en banc); accordingly, on receipt of the mandate, the chief judge of the Middle District of Alabama will assign the case to himself or another district judge (other than Judge Thompson) for the purpose of enabling plaintiffs' counsel to show cause why section 1927 sanctions should not be awarded to the Adams Intervenors.

---

[26]  Rule 38 states: "If a court of appeals determines that an appeal is frivolous, it may, after a separately filed motion or notice from the court and reasonable opportunity to respond, award just damages and single or double costs to the appellee."  See also 28 U.S.C. § 1912 (1994) (allowing court of appeals to award "just damages . . . and single or double costs" when "a judgment is affirmed").

In No. 98-6192, we conclude that the issue is a closer one. We assume that plaintiffs' counsel are not responsible for the district court's sua sponte decision to transform their application for a permanent injunction into an application for a declaratory judgment. As the district court itself acknowledged, it should have dismissed counsel's application for a permanent injunction under the authority of Newman v. Alabama, 683 F.2d at 1318.

IV.

In conclusion, in No. 97-6347, we vacate the district court's preliminary injunction and instruct the court to strike plaintiffs' counsel's application for injunctive relief. In No. 98-6192, we vacate the court's declaratory judgment and instruct the court to strike from the record counsel's application for a permanent injunction. The court is instructed to restore the case to the status quo ante, which means nothing has happened in this case since August 9, 1995, when the district court entered its Order and Injunction, amending Consent Decree I to incorporate the Revised Complaint Procedure.

SO ORDERED.

28

STORY, District Judge, concurring in part and dissenting in part:

I agree with the majority's decision vacating the district court's preliminary injunction in No. 97-6347 and instructing the district court to strike Plaintiffs' application for injunctive relief and vacating the district court's declaratory judgment in No. 98-6192 and instructing the district court to strike from the record Plaintiffs' application for permanent injunctive relief. However, as to Part III of the majority opinion, I dissent.

The majority charges plaintiffs' counsel with "proceeding strictly on their own" and "representing no one but themselves" in their pursuit of an injunction to prohibit the use of the Revised Complaint Procedure by non-blacks. I do not ascribe such sinister motives to plaintiffs' counsel. We must not lose sight of the history of this case. Hopefully, we are in the final chapter of a series of suits brought to end pervasive discrimination within the Alabama Department of Transportation ("ALDOT"). It is against this background that counsel's motives should be judged. For example, evidence presented at the 1992 trial concerning the alleged pre-decree practice which allowed supervisors and employees to circumvent the merit selection process through provisional promotions reasonably raised counsels' concerns that the new procedure might be abused. Plaintiffs'

29

counsel thus had a legitimate concern that the Revised Complaint Procedure might violate Consent Decree I.  Based upon the orders it entered, the district court apparently shared these concerns.

Because there is no evidence to support a finding that the Revised Complaint Procedure was being used by ALDOT officials to violate Consent Decree I or in an otherwise discriminatory manner, the relief granted by the district court cannot be justified.  However, this historical evidence arguably justified action being taken by plaintiffs' counsel to get the issue before the district court for consideration. Except for the majority's findings about plaintiffs' counsel's motives, I **CONCUR** fully in the analysis of the majority in Parts I, II, and IV.

As to Part III, I would not impose § 1927 sanctions.  Though plaintiffs' counsel sought the wrong form of relief, they were attempting to be vigilant in protecting their clients' rights rather than being unreasonable and vexatious. Therefore, as to Part III of the majority opinion, I **DISSENT**.