[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT



FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 22, 2003
THOMAS K. KAHN
CLERK

No. 98-6164

D. C. Docket No. 85-00665-CV-T-N

JOHNNY REYNOLDS, individually and on
behalf of himself and representative
of a class of black employees of the
Highway Department, State of Alabama,
similarly situated,

Plaintiff-Appellee,

CECIL PARKER, et al.,

Intervenors-Plaintiffs,

WILLIAM ADAMS,
CHERYL CAINE,
TIM COLQUITT,
WILLIAM FLOWERS,
WILSON FOLMAR,
GEORGE KYSER,
BECKY POLLARD,
RONNIE POUNCEY,
TERRY ROBINSON,
TIM WILLIAMS, on behalf of
themselves and all similarly situated
persons (Non-Class Employees),

Intervenors-Plaintiffs-Appellants,

versus

JOE MCINNES, in his official capacity as
Director of the Alabama Department of
Transportation,
HALYCON VANCE BALLARD, individually,
TOMMY G. FLOWERS, as Director of Personnel
Department, State of Alabama,
DEPARTMENT OF TRANSPORATION, STATE OF ALABAMA,
DEPARTMENT OF PERSONNEL, STATE OF ALABAMA,
BOB RILEY, in his official capacity as
Governor of the State of Alabama,

                                        Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Alabama
_____

**(July 22, 2003)**

Before CARNES, HILL and FARRIS[*], Circuit Judges.

CARNES, Circuit Judge:

This appeal arises out of the ongoing <u>Reynolds</u> employment discrimination

litigation between the defendants Alabama Department of Transportation

(ALDOT) and the State Personnel Department (SPD), two plaintiff classes of

black employees and prospective employees of ALDOT, and an intervening class

_____

[*]Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

2

of non-black employees. The litigation has been ongoing for eighteen years, and before today we have previously issued published opinions in five separate appeals arising out of it.[1] We have eight appeals involving the case presently pending at one stage or another before us. This one results from the district court's February 11, 1998 order, in the nature of an injunction, requiring ALDOT to implement certain multi-grade job classifications in order to comply with Article Fifteen, ¶ 3 of a 1994 consent decree in the case. The defendants contend that the district court erred in entering that injunctive relief without conducting contempt proceedings. Alternatively, they contend that the district court erred in interpreting and applying Article Fifteen, ¶ 3 of the consent decree. As we will explain, we conclude that the defendants' first contention is barred because it was not raised in the district court, but we agree with their second one. We also have some observations to make about the litigation as a whole.

## I. BACKGROUND AND PROCEDURAL HISTORY

The complicated procedural history of the underlying case has been set forth in detail in three of our previous opinions. Reynolds v. Roberts, 251 F.3d 1350,

---

[1]See Reynolds v. Butts, 312 F.3d 1247 (11th Cir. 2002) ("Reynolds IV"); Davis v. Butts, 290 F.3d 1297 (11th Cir. 2002); Reynolds v. Roberts, 251 F.3d 1350 (11th Cir. 2001) ("Reynolds III"), cert. denied, 534 U.S. 1161, 122 S. Ct. 1171 (2002); Reynolds v. Roberts, 207 F.3d 1288 (11th Cir. 2000) ("Reynolds II"), cert. denied, 533 U.S. 941, 121 S. Ct. 2576 (2001); Reynolds v. Roberts, 202 F.3d 1303 (11th Cir. 2000) ("Reynolds I").

1352-55 (11th Cir. 2001) ("Reynolds III"), cert. denied, 534 U.S. 1161, 122 S. Ct. 1171 (2002); Reynolds v. Roberts, 207 F.3d 1288, 1292-93 (11th Cir. 2000) ("Reynolds II"), cert denied, 533 U.S. 941, 121 S. Ct. 2576 (2001); Reynolds v. Roberts, 202 F.3d 1303, 1305-07 (11th Cir. 2000) ("Reynolds I"). We assume the reader's familiarity with that history but will summarize it briefly before moving to the particular facts and events material to this appeal.

In 1985, the named plaintiff brought this suit against ALDOT, SPD, and various state officials on behalf of all black employees and applicants for employment with ALDOT. The complaint alleged racial discrimination in violation of the Fourteenth Amendment to the Constitution, Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e to 2000e-17), and 42 U.S.C. § 1981. The district court certified three plaintiff classes: (1) a class of all black merit employees of ALDOT who had been denied promotion; (2) a class of all black non-merit employees who had unsuccessfully sought employment as merit employees; and (3) a class of all black non-employees who had unsuccessfully sought employment as merit employees. Reynolds II, 207 F.3d at 1292 n.2. The district court later combined the second and third classes into a single class. Reynolds III, 251 F.3d at 1353 n.2.

4

In 1993, the parties reached a partial settlement and presented a proposed consent decree to the district court. Before a fairness hearing was held, a group of white ALDOT employees moved the court for leave to intervene on behalf of ALDOT's employees who were not part of the plaintiff classes.[2] The intervenors objected to certain race-conscious provisions in the proposed consent decree. The parties agreed to divide the proposed consent decree into three separate parts, and the part that the parties call Consent Decree I was approved in March 1994.[3] Id. at 1354.

The appeal before us concerns Article Fifteen of that 1994 consent decree, which provides for the reclassification of certain multi-grade jobs within ALDOT. Multi-grade jobs consist of several levels within a single job classification that

---

[2]The district court certified the intervenors as a class, consisting of all non-black merit system employees of ALDOT, in April 1998. Reynolds II, 207 F.3d at 1293. The intervenors join ALDOT here as appellants.

[3]The portions of the 1994 proposed consent decree that the parties call Consent Decrees II and III have not been approved by the district court, except for one paragraph of Consent Decree II that the district court approved and adopted in Reynolds v. Ala. Dep't of Transp., 996 F. Supp. 1118, 1119-20 (M.D. Ala. 1998). We reversed its order doing so in Reynolds III, holding that the court erred in sua sponte entering an injunction that affected the legal rights of the parties without receiving evidence and ruling upon the objections of the affected parties or obtaining their consent to the injunction. 251 F.3d at 1352. Our opinion in that appeal also noted that what the parties call Consent Decrees II and III are not really consent decrees, but merely proposed consent decrees that only the plaintiffs currently support. Id. at 1356-57.

Any further reference in this opinion to the "consent decree" is to that portion of the original proposed decree that the district court approved in 1994.

correspond to differences in duties, responsibilities, and qualifications. Article Fifteen, ¶ 3(a) requires SPD to study certain multi-grade job classifications, including the jobs of Engineering Assistant (EA) and Civil Engineer (CE).[4] When the study began in 1994, those jobs had several classification levels: EA was classified into three levels (I, II, and III), and CE was classified into four levels (I, II, III, and IV).

The consent decree provides that upon completion of the job classification study, the jobs may be collapsed or restructured in order to comply with the decree. Article Fifteen, ¶ 3(b) requires:

> In the event such job classification study discloses that existing distinctions in the levels of multi-grade jobs do not reflect actual differences in duties, responsibilities, or qualifications, the jobs will be collapsed or restructured so that (i) they will reflect the actual distinctions, if any, shown by the study and (ii) are capable of being administered and utilized so that only persons occupying that classification perform the duties associated with it on a regular or non-emergency basis.

In practice, after completing the study, SPD made recommendations to the State Personnel Board about how to restructure ALDOT jobs in the manner required by Article Fifteen.

---

[4]Article Fifteen, ¶ 3(a) requires SPD to conduct a study of the following multi-grade job classifications: Engineering Assistant, Civil Engineer, Professional Civil Engineer, Highway Maintenance Technician, Highway Maintenance Superintendent, Right-of-Way Specialist, and Project Cost Auditor.

Pursuant to Article Fifteen, ¶ 3(b), upon completion of the job classification study and consistent with its results, on April 17, 1996, SPD recommended and the State Personnel Board approved a new classification structure for ALDOT. (The specifics of the study and how SPD arrived at the new structure are discussed in detail later in this opinion.) Among other recommendations, the new structure called for the collapse of the former classifications of EA II and III into EA II/III, of CE I and II into CE I/II, and of CE III and IV into CE III/IV.

The plaintiffs filed objections to the results of the job classification study in December 1996. One of their objections was to the proposed restructuring of the EA and CE jobs. The plaintiffs objected on the grounds that the proposed structure was inconsistent with the empirical results of the SPD study and that it did not satisfy the requirements of ¶ 3(b) of the consent decree. They requested that the district court modify SPD's classification plan by collapsing all Article Fifteen, ¶ 3(a) classifications so that there would be a single EA classification and a single CE classification.

With the parties' consent, the district court referred issues concerning the job classification study to the magistrate judge for his report and recommendations. The magistrate judge held an evidentiary hearing on the matter on June 17 and 18, 1997. He reviewed the descriptions for jobs in the new

7

classification structure using a progression/promotion distinction (suggested by an expert for the defendants as one possible way of differentiating between jobs), with the "progression" label being applied when the job duties changed little except in terms of complexity, responsibility, or difficulty, and the "promotion" label being applied when the job duties changed to a higher level.

The magistrate judge concluded that the proper construction of ¶ 3(b) was that in different levels of a job classification the employees may perform similar duties as long as higher levels of the classification reflect true distinctions that are more than just progressions in proficiency. He concluded that the proposed EA I and EA II/III positions had no distinction other than proficiency in the performance of the duties of the positions. Further, he concluded that the only major distinctions between the CE I/II and CE III/IV positions were in the level of the supervisory responsibilities and the level of the complexity of the jobs, and he characterized those distinctions as only progressions in proficiency. Therefore, he determined that SPD's proposed classifications for EA and CE did not comply with the consent decree. He recommended that the EA and CE jobs be consolidated into single classifications, as the plaintiffs had proposed.

The defendants objected to the magistrate judge's recommendations that the EA and CE jobs be combined into single classifications.[5] Along with their objections, the defendants submitted an affidavit from their experts regarding testing performed after the hearing had been completed. That affidavit supported the defendants' position that there were serious problems with the plaintiffs' proposed classifications and the qualifying tests that would be used for hiring for those new positions under the magistrate judge's recommendations. Nevertheless, on February 11, 1998, the district court adopted the magistrate judge's recommendations in their entirety without considering any further evidence – it specifically refused to consider the affidavit submitted by the defendants – and ordered the defendants to "implement a single engineering assistant classification immediately" and "a single civil engineer classification immediately."

The defendants appealed the district court's order (this is that appeal). However, the appeal was stayed from June 1999 until January 2002 while the parties attempted to work out an alternative implementation for the multi-grade classifications. When the parties' attempt to settle the matter proved unsuccessful,

---

[5]The plaintiffs also objected to the magistrate judge's recommendation because the magistrate judge accepted SPD's restructuring plan for the other ¶ 3(a) jobs. However, EA and CE are the only multi-grade jobs at issue in this appeal, because the district court, like the magistrate judge, accepted SPD's restructuring recommendations for the other ¶ 3(a) jobs.

9

the stay of the appeal was lifted. Although the appeal from the district court's February 11, 1998 order, which required the defendants to collapse the job classifications, was stayed, the order itself was not.

Even though that order was not stayed, the defendants did not promptly comply with it, either by implementing the new classifications for the two jobs that are the subject of this appeal (EA and CE) or by implementing the approved classifications for any other jobs listed in Article Fifteen, ¶ 3(a). In April 1998, the plaintiffs moved to hold the defendants in contempt for failing to comply with the requirements of Article Fifteen as to all jobs, including the two at issue here. The plaintiffs asserted two grounds for contempt: the defendants' failure to comply with Article Fifteen, ¶ 3 of the consent decree, and their failure to comply with the February 11, 1998 order.

On May 4, 1998, the district court entered a show-cause order requiring the defendants to respond to the plaintiffs' motion to hold them in contempt. The defendants responded that they should not be held in contempt of either Article Fifteen of the consent decree or the court's February 11, 1998 order. They maintained that they had complied with Article Fifteen, ¶ 3 of the consent decree, by completing the job classification study and approving a classification plan, but that they had failed to implement the new classification plan because of ongoing

10

proceedings related to it in the district court. The defendants also claimed that they had, in fact, substantially complied with the February 11, 1998 order, and were attempting to implement the order in a way that would assure a smooth transition into the new classification structure.

Instead of proceeding to a hearing on the contempt motion, however, the defendants agreed to implement the new classifications as required by the February 11, 1998 order. On June 8, 1998, the district court entered an order requiring the defendants to implement the expanded pay ranges for all of the new classifications that were the subject of its February 11, 1998 order. The defendants implemented the collapse of the EA and CE classifications and the expanded pay ranges for the classifications and certified that they had done so to the district court. They did not appeal the June 8, 1998 order.[6]

---

[6]The June 8, 1998 order did not render this appeal moot, because it and the February 11 order addressed different aspects of the consent decree. The requirement that the jobs be collapsed or restructured in the event that the job classification study showed that existing distinctions in the jobs did not reflect actual differences between them is found in Article Fifteen, ¶ 3(b). Paragraphs 3(c) and (d) of Article Fifteen address broadening the pay ranges within the new classifications, and ¶ 3(d) requires that the defendants assign persons to pay ranges which reflect their years of service if levels in the jobs are collapsed. Although restructuring the job classifications and implementing the new pay ranges are related, they are not the same thing. The district court's June 8 order, by its terms, only required the defendants to implement the new pay ranges for the classifications. This order is distinct from the February 11 order which required the defendants to implement the new classifications themselves.

The defendants' compliance with the February 11 order also does not render this appeal moot. Voluntary compliance with an injunctive order does moot an appeal if we cannot grant the complying appellant relief. Burnett v. Kindt, 780 F.2d 952, 955 (11th Cir. 1986); Newman v.

Disputes about the Article Fifteen classifications continued, however, and further proceedings eventually resulted in an omnibus civil contempt order issued in January 2000, which found the defendants in contempt for failing to obey aspects of the consent decree, including some provisions of Article Fifteen but not the ones relating to the two classifications at issue in this appeal. That January 2000 order imposed deadlines for the defendants to comply with each article of the consent decree. The defendants began paying contempt fines in February 2000 and continue to pay them at the present time.

## II. DISCUSSION

### A. THE DEFENDANTS' FAILURE TO OBJECT TO THE DISTRICT COURT'S USE OF NON-CONTEMPT PROCEEDINGS TO ENFORCE THE DECREE

---

Alabama, 683 F.2d 1312, 1317 (11th Cir. 1982). Unlike the one in the present case, the injunctive orders at issue in Burnett and Newman required the appealing parties to perform discrete acts and were not continuing injunctions. In Burnett, a warden appealed from the district court's order that he make an inmate available for a parole hearing. 780 F.2d at 954. Because the warden had voluntarily complied with the order, and the inmate had received the hearing and been released on parole, we could not grant the complying warden relief; so, the appeal was moot. Id. at 954-55. In Newman, the district court ordered hundreds of specifically named inmates released after Alabama had not complied with orders designed to reduce overcrowding conditions in state prisons. 683 F.2d at 1316. We held that the state's appeal was moot because the state had fully complied with the order. The injunction was not a continuing injunction but an order for the state to perform discrete acts, and no action of ours could have changed what had been done. Id. at 1317. In this appeal, by contrast, the injunction did not order discrete actions that cannot be undone, but instead has ongoing application to job classifications that are being applied and will continue to be applied in the future unless we overturn the order.

12

The defendants' initial argument that the district court's February 11, 1998 order must be vacated relies on Reynolds II. Their argument is: Because the district court did not follow the proper contempt proceedings for enforcing compliance with Article Fifteen, ¶ 3, including requiring the plaintiffs to move for contempt, the district court erred in entering the February 11, 1998 order, just as it erred in entering the order that was vacated in the Reynolds II appeal.

In Reynolds II, we emphasized that consent decrees, like all injunctions, are to be enforced through the trial court's civil contempt power. 207 F.3d at 1298 (citing In re Grand Jury Proceedings, 142 F.3d 1416, 1424 (11th Cir. 1998); Newman v. Alabama, 683 F.2d 1312, 1317-19 (11th Cir. 1982)). We have spelled out the procedures for enforcing consent decrees several times. See Thomason v. Russell Corp., 132 F.3d 632, 634 n.4 (11th Cir. 1998); Wyatt ex rel. Rawlins v. Rogers, 92 F.3d 1074, 1078 & n.8 (11th Cir. 1996); Newman, 683 F.2d at 1318. If the plaintiffs believe that the defendants are failing to comply with a decree, in order to enforce it the plaintiffs must move the court to issue an order for the defendants to show cause why they should not be adjudged in civil contempt and sanctioned. Reynolds II, 207 F.3d at 1298. The show cause motion should cite the injunctive provisions at issue and set out that the defendants have refused to obey the decree. Id. If satisfied that the plaintiffs' motion states a case for non-

13

compliance, the court should order the defendants to show cause why they should not be held in contempt and schedule a hearing on it. Id.

At the show cause hearing, under the Reynolds II procedure, if the plaintiffs prove what they have alleged in their motion, the defendants are given the opportunity to respond. After that, the court must determine whether the defendants have complied with the provision at issue and, if not, decide what sanctions are necessary to ensure compliance. Id. In Reynolds III, we reiterated that these are the proper procedures to be followed for the enforcement of consent decrees. 251 F.3d at 1358 n.14.

In Reynolds II, these same plaintiffs moved the district court for a temporary restraining order to prevent ALDOT from implementing three grievance resolutions for white employees, resolutions that had resulted from procedures provided in Article Nineteen of the consent decree. 207 F.3d at 1294, 1296. The plaintiffs alleged that implementing those grievance resolutions would violate the decree. The district court entered the temporary restraining order. The plaintiffs then applied for a preliminary injunction, asking the court to extend the temporary restraining order until their application could be heard. The court extended the order and scheduled a hearing on the application for a preliminary injunction. Id.

14

at 1296. The hearing proceeded as scheduled, the court issued the preliminary injunction, and the intervenors appealed. Id.

After the hearing but before the district court ruled in Reynolds II, the plaintiffs applied for another preliminary injunction, asking the court to prevent ALDOT from implementing any grievance resolutions involving non-black employees – not just the three specifically involved in their first application for preliminary relief – because doing so would violate the consent decree. Id. The district court treated that second application as one for a permanent injunction and held hearings. Instead of granting the application for a permanent injunction, the court sua sponte granted the plaintiffs declaratory relief. Id. at 1296-97. The court did so because it determined that issuing an order enjoining ALDOT from hearing the grievances of all non-black employees would be inappropriate. It reached that conclusion because we had clearly instructed that consent decrees, like other injunctions, are to be enforced through the district court's contempt power. Id. at 1297. We vacated the district court's declaratory relief order in Reynolds II because the court had failed to follow the appropriate contempt procedures for enforcing a consent decree. Id. at 1300-01.

And we should do the same thing in this appeal, the defendants say. The problem for them is that they did not object in the district court to its failure to

15

follow the proper procedures for enforcing a decree. "A general principle of appellate review is that an appellate court will not consider issues not presented to the trial court." McGinnis v. Ingram Equip. Co., 918 F.2d 1491, 1495 (11th Cir. 1990) (en banc).

The defendants seek to excuse their failure to object to the defective procedure in this case by saying they failed to object to it in Reynolds II as well, but this Court nonetheless reversed the district court for doing the same thing it did here. The opinion this Court issued in Reynolds II does not indicate that the defendants failed to preserve the defective procedures issue in the district court, but the plaintiffs don't seem to deny it, either. The question arises as to whether there is an implicit holding in Reynolds II that for some undisclosed reasons the lack of an objection to the district court's failure to follow proper procedures for enforcing the consent decree in that case did not bar consideration of that issue on appeal. We need not answer that question, because the circumstances regarding the failure to object are sufficiently different in the two cases that they are distinguishable.

Even if there is an implicit holding in Reynolds II applying some kind of exception to the contemporaneous objection rule in that case, the prior panel precedent rule does not require us to expand that exception beyond the particular

16

circumstances of that case, and we decline to do so. Because the contemporaneous objection rule is critically important to the proper functioning of our judicial system, see United States v. Pielago, 135 F.3d 703, 709 (11th Cir. 1998), any exceptions to it should be narrowly construed and seldom applied. The key procedural facts before us in this appeal differ from those in Reynolds II, because here the defendants did not merely fail to object to application of the wrong procedures; they were complicit in their application. Unlike Reynolds II, this appeal does not involve a challenge to a sua sponte action by the district court. Instead, the procedure complained of in this appeal is one the defendants as well as the plaintiffs sought. This error in this case approaches the stage of invited error. Whether it gets there is something we need not decide, because what happened here is different enough from what happened in Reynolds II to release us from any obligation to follow an implicit holding of that decision, if there be one, concerning the simple failure to object to the procedures used.

Here, when the plaintiffs filed their objections to the results of the job classification study and requested that the court modify the classification structure so that there would be single classifications for the EA and CE jobs, the defendants filed their response asking the court to accept SPD's plan as it was, maintaining that the "classification structure is due to be approved and

17

implemented." After the district court referred the issues regarding the job classification study to the magistrate judge, the defendants in a letter to the magistrate judge "urge[d] the Court to consider and rule on the Article Fifteen issues without further delay." When the plaintiffs sought additional discovery related to the Article Fifteen issues, the defendants in opposing such discovery, "submit[ted] that the Court should promptly schedule a hearing to resolve all issues in the multigrade job study." Finally, in a memorandum to the court following the hearing on the study, the defendants again argued that SPD's classification plan complied with Article Fifteen of the consent decree and that "[t]he new classification structure should be approved." Instead of opposing use of the procedures being employed, the defendants urged that they be employed to resolve the dispute in their favor.

The defendants' affirmative requests for the magistrate judge and the district court to approve SPD's proposed classification plan and allow implementation of the plan over the plaintiffs' objections, using the procedures the court was employing, make this situation distinguishable from the one in Reynolds II. There, the district court sua sponte granted the plaintiffs declaratory relief after they requested the second preliminary injunction. Reynolds II, 207 F.3d at 1296-97. Although the defendants apparently did fail to object to the procedures

employed in Reynolds II, the opinion in that case does not indicate that they were otherwise a party to the court's error. In this case, the defendants urged the court to take action on the job classification study using the procedures it was employing, which did not include conducting contempt proceedings, and now they seek to undo on procedural grounds the unfavorable result of the very proceedings that they spurred on. There is a difference between protesting relief being sought by the opposing party when the court is using improper procedures (Reynolds II), and urging relief favorable to yourself from use of those same improper procedures (this case).

Accordingly, because the procedural facts in this appeal are different from those in Reynolds II, we are free to and do apply the contemporaneous objection rule and will not overturn the district court's February 11, 1998 order because of the court's failure to employ the proper procedures to enforce Article Fifteen, ¶ 3(b) of the consent decree. Instead, we will review that order on the merits, deciding whether the district court erred in interpreting and applying Article Fifteen, ¶ 3(b) to the proposed job classifications.

## B. THE DISTRICT COURT'S INTERPRETATION AND APPLICATION OF ARTICLE FIFTEEN, ¶ 3(B) OF THE CONSENT DECREE

### 1. Standard of Review

We apply the same rules that govern contract interpretation when we interpret a consent decree, because a consent decree is essentially a form of contract. Reynolds I, 202 F.3d at 1312-13. The inquiry in this case involves both the district court's interpretation of what the consent decree requires and its application of that interpretation to SPD's recommendations based on the job classification study. As such, our inquiry here is a mixed question of law and fact, and those are reviewed de novo. See Int'l Ins. Co. v. Johns, 874 F.2d 1447, 1453 (11th Cir. 1989) (interpretation of contract and application of it to the facts is mixed question of law and fact reviewed de novo); Backar v. Western States Producing Co., 547 F.2d 876, 883-84 (5th Cir. 1977) (same)[7]; see also 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2589 (2d ed. 1995) (mixed questions of law and fact are "freely reviewable"). If any relevant facts were disputed, we would be required to accept the district court's factfindings unless they were clearly erroneous, but there are no disputed facts.

---

[7]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

The question turns on interpretation of the consent decree and application of it to the facts.

The plaintiffs bear the burden of proof on their objections. For the reasons we have discussed, the defendants cannot now put the district court in error for its failure to utilize contempt proceedings, but it is relevant that a motion by the plaintiffs asking for the defendants to be held in contempt (technically a motion for issuance of a show cause order) would have been the proper way for the plaintiffs to object to the defendants' job classification plan. See Reynolds II, 207 F.3d at 1298. That is relevant, because if that procedure had been followed the plaintiffs would have had the burden of proving by clear and convincing evidence what they alleged in their motion. See Riccard v. Prudential Ins. Co., 307 F.3d 1277, 1296 (11th Cir. 2002) ("A finding of civil contempt . . . must be supported by clear and convincing evidence."); United States v. Money, 744 F.2d 779, 780 (11th Cir. 1984) (party moving for contempt must show by clear and convincing evidence that a court's order has been violated). The plaintiffs' failure to follow the proper procedure should not, and does not, relieve them of their burden to prove by clear and convincing evidence that the defendants' job classification plan fails to comply with Article Fifteen, ¶ 3(b) of the consent decree. The district court erred in failing to apply that standard of proof, but it matters little, if at all,

21

because the facts are not really at issue. We will apply the applicable legal standard to them ourselves.

## 2. The Job Study and SPD's Proposed Classifications

Article Fifteen, ¶ 3(b) requires that jobs be collapsed or restructured "[i]n the event [the] job classification study discloses that existing distinctions in the levels of multi-grade jobs do not reflect actual differences in duties, responsibilities, or qualifications." If the job classification study does disclose that, the jobs are to be collapsed or restructured so that (i) they "reflect the actual distinctions, if any, shown by the study," and (ii) they "are capable of being administered and utilized so that only persons occupying that classification perform the duties associated with it on a regular or non-emergency basis." At the hearing the magistrate judge conducted on the matter in June 1997, the plaintiffs and defendants agreed that the dispute was over whether SPD's proposed classifications complied with parts (i) and (ii) of ¶ 3(b). The issues, then, are whether SPD's proposed classifications reflect the actual distinctions shown by the study and whether the new jobs are capable of being administered or utilized so that only persons occupying the jobs perform the duties associated with them on a regular basis.

After investigating several methods for performing the job classification study, SPD selected the Position Analysis Questionnaire (PAQ) as the method for conducting it. Before the PAQ itself could be administered, SPD analysts gathered information from all ALDOT employees about their job duties, using questionnaires called Form 40s. The SPD analysts sorted the Form 40s into "functional areas" for each classification, based on the type of work being performed, the location in which the incumbent worked, and the job of the incumbent's supervisor. For example, the EA I classification included functional areas such as Bridge Inspection, Materials Tester, and Surveying. SPD then administered the PAQs to a random sample of ALDOT employees in the functional areas in order to obtain information about the work being performed within each classification.

As part of the PAQ study, analysts interviewed the incumbents in the jobs to gather additional information about the job, including a brief description of the duties of the position and detailed information about the skills required to perform it. The PAQ is designed to obtain information about a job in six areas: where and how information needed for the job is gained; what mental processes (like reasoning, decision-making, and planning) are needed for the job; what physical activities are required for the job; what relationships with other persons are needed

to perform the job; in what physical and social context the job is performed; and information about any other important job characteristics. The PAQ also requires the interviewee to rate the importance of the informational areas to performance of the job.

The PAQ results were then scored and analyzed by SPD's experts, Jeanneret and Associates, and specifically by Dr. Morton McPhail. Jeanneret and Associates assigned PAQ "points" for each individual PAQ interview and reported the results to SPD. The PAQ points represent the different attributes and requirements of a job, such as reading and decision-making, rather than the job's specific duties. The PAQ points were then grouped both by average for each classification and by averages within each functional area. Jeanneret and Associates provided SPD with some suggestions of other items to consider in looking at the PAQ results, such as how the jobs were actually structured, ALDOT's organizational structure, the relationships between the jobs for hiring purposes, and the particular needs of ALDOT. Dr. McPhail advised SPD on interpreting the results of the PAQ study. He suggested to SPD that a difference of 100 PAQ points between jobs was probably a meaningful distinction and would constitute a real difference between them. He testified at the hearing that he suggested from that "starting point," SPD

24

could then evaluate the extent to which the difference was meaningful in the context of the ALDOT jobs.

Starting with the 100-point differential, SPD eliminated any outliers shown in the data. It determined, for example, that some positions in the EA classification, such as Drill Crew Chief 2 and 3, belonged in the CE classification. After eliminating outliers, SPD determined that the PAQ range for the EA classification was from 470.33 points to 674 points. This range indicated to SPD that there should be two classes for EA. SPD concluded that the EA I and III jobs were relatively non-overlapping. SPD also concluded that EA II and III should be combined because the EA II jobs were a closer match for EA III than EA I. For the jobs in the CE classification, the average points were as follows: CE I, 711.03; CE II, 725.32; CE III, 797.15; CE IV, 828.76. SPD concluded the average PAQ points supported combining CE I and II into a single job classification and CE III and IV into a single job classification. The break of 71.83 points between the CE II and III averages indicated to SPD that those classes should not be combined. Dr. McPhail testified at the hearing before the magistrate judge that the proposed classifications were "not inconsistent" with the PAQ points and study.

Once the PAQ analysis was complete, SPD analysts and industrial psychologists considered the appropriate classification levels within each job.

25

They considered the following factors in determining what changes should be made in the classification structure: (1) the PAQ points and analysis thereof; (2) ALDOT's organizational structure; (3) ADLOT's needs for its classification structure; (4) SPD's knowledge of the duties performed by each classification obtained through actually conducting the PAQ interviews; (5) SPD's understanding of ALDOT's internal structure and needs; and (6) information gathered through studying the structures of transportation departments of other states.

SPD then wrote the new job descriptions for the proposed classification structure. The new EA I position requires limited skill in assisting on engineering projects and is the entry level for engineering positions in design, construction, traffic surveying, and materials testing. Some tasks performed by employees in the EA I position include serving as rodmen or targetmen on survey parties, inspecting simple construction project activities, counting and classifying motor vehicles, performing simple materials testing, and assisting in the inspection of bridges and bridge structures. According to the job description, the EA I position is distinguished from other engineering positions in that incumbents need no prior experience and receive training in an engineering specialty area. The work is frequently reviewed by a supervisor.

The EA II/III position, in contrast, involves moderately complex routines in instrument operations, testing, drafting, surveys, and computing. Employees draft plans for bridge components, serve as lead instrument workers on survey parties, serve as highway or bridge inspectors by inspecting building materials, perform moderately complex field and laboratory tests, and serve as party chiefs in parties collecting traffic data. EA II/III employees may supervise the work of a few less skilled assistants. The SPD job description for EA II/III distinguishes the position from EA I in that EA II/III employees are supposed to be fully functional within a specialty area such as materials testing, construction inspection, surveying, or transportation planning activities.

In the CE I/II position, employees are assigned as assistant project engineers responsible for supervising the construction and inspection of simple to moderately difficult roadway and bridge projects, producing complete sets of roadway plans, supervising transportation planning activities, or overseeing materials testing. They supervise engineering parties, assist in planning survey work and may serve as assistant project engineers on large, complex roadway and bridge projects. The SPD specifications distinguish this position from EA II/III in that CE I/II employees are assigned more complex projects which typically involve some supervisory duties.

Employees in CE III/IV positions are assigned as senior project engineers and oversee complex roadway and bridge construction projects. They direct the preparation of sets of finished bridge and culvert plans, supervise the activities of groups of roadway plan designers, supervise testing activities and foundation investigations, and supervise bridge inspection activities within an operating division. Additionally, CE III/IV employees work with utility companies and the public regarding utility work within the state right of way, design highway facilities and buildings, and review plans and specifications for large public buildings. SPD distinguishes the CE III/IV position from the CE I/II position because CE III/IV employees are assigned complex projects that involve substantial supervisory responsibility over other employees.

### 3. Interpretation and Analysis

Before determining whether the plaintiffs met their burden of establishing by clear and convincing evidence that the defendants failed to comply with Article Fifteen, ¶ 3(b) of the consent decree, we must determine exactly what constitutes compliance with it. The phrase "actual distinctions, if any, shown by the study" in ¶ 3(b)(i) must be understood as referring back to the first part of ¶ 3(b), which mandates restructuring when "existing distinctions" do not reflect "actual differences in duties, responsibilities, or qualifications." It follows that focusing

28

exclusively on the duties of the proposed classifications ignores the parties' intent that the new classifications may also be based on differences in responsibilities and qualifications. All three elements – duties, responsibilities, and qualifications – may be sources of difference between the new classifications, as long as the jobs are, under ¶ 3(b)(ii), "capable of being administered and utilized so that only persons occupying that classification perform the duties associated with it on a regular or non-emergency basis." Paragraph 3(b)(ii), however, does not require that employees holding two different jobs have none of the same duties. Instead, it prevents employees from performing duties on a regular basis that are not associated with the jobs that they hold.[8]

At the hearing, the plaintiffs attempted to show that SPD's proposed classification structure did not comply with the consent decree in two ways. First, they argued that the structure was not in keeping with the empirical results of the job classification study and so did not comply with Article Fifteen, ¶ 3(b), because fewer than 100 PAQ points separated the new jobs in SPD's proposed classes. They introduced evidence that the PAQ points associated with EA I and EA II/III

---

[8]As our discussion indicates, we do not use the progression/promotion distinction that the magistrate judge employed. The decree itself provides the method for determining when jobs must be collapsed, and the progression/promotion distinction is not particularly useful in determining differences between jobs. Instead of attempting to characterize the difference between jobs as a progression or promotion, we find it more helpful to focus directly on whether there are meaningful distinctions in duties, responsibilities, and qualifications.

29

and with CE I/II and CE III/IV overlapped. However, Dr. McPhail and other witnesses testified that an overlap in points or a difference of fewer than 100 PAQ points between jobs, standing alone, does not necessarily mean that jobs should be combined. Instead, an overlap in PAQ points should be evaluated in light of whether the distinction between the classifications is a meaningful one. Dr. McPhail also testified that the determination of whether an overlap of PAQ points results from anomalies in the data or an actual lack of distinction between the jobs cannot be made by looking at the PAQ points alone.

The second way in which the plaintiffs attempted to prove that SPD's proposed classification structure did not comply with the consent decree is by showing that the new jobs were not "capable of being administered and utilized so that only persons occupying that classification perform the duties associated with it on a regular or non-emergency basis." That was shown, the plaintiffs asserted, by the fact that a strict division between duties in the proposed classifications was impossible. However, a strict division between the jobs is not required in order for the classification to comply with ¶ 3(b)(ii), because, as we have explained, that subparagraph requires only that employees not regularly perform duties that are not associated with their jobs. Contrary to the plaintiffs' assertion, it does not impose an additional requirement that no duty can be assigned to multiple jobs.

30

The plaintiffs simply did not provide clear and convincing evidence that the proposed classifications do not reflect the actual distinctions shown by the study. They offered no evidence at all other than the PAQ point differential of fewer than 100 points between the jobs and the overlap in points between some jobs to support their assertion. They offered no explanation based on any evidence before the court that a difference of fewer than 100 PAQ points between jobs necessarily means that the jobs must be collapsed. There is no evidence in the record to dispute the defendants' evidence that a differential of fewer than 100 PAQ points, standing alone, does not mean that jobs must be combined. Dr. McPhail, the defendants' expert, from whom the plaintiffs drew the argument about the 100-point differential, explained that it was only a "starting point," and that additional factors and circumstances must be considered in determining whether there was an actual difference between two jobs. The plaintiffs presented no evidence to dispute his testimony on that issue. The PAQ point results themselves are not clear and convincing evidence that the resulting structure does not comply with the decree.[9] We emphasize that PAQ points go to job attributes, such as reading

_____

[9]The plaintiffs' brief focuses on overlapping PAQ points in the EA and CE classifications and the PAQ points for some of the specific functional areas within those classifications. They contend that virtually none of the positions (or functional areas) in the two classification levels proposed by the defendants satisfied the preliminary 100-point differential. The plaintiffs detail how some of the positions rated higher in PAQ points at the lower levels of the classifications than they did at the higher levels of the classifications. For example, the plaintiffs point out that

31

and decision-making. Under ¶ 3(b)(i), whether a distinction between two jobs is a meaningful one is determined by looking to duties, responsibilities, and qualifications. The job classification study here did that.

Moreover, the job descriptions themselves do reveal actual distinctions between the jobs. The EA I and II/III positions are distinguishable by their duties, because EA I employees serve as rodmen while EA II/III employees serve as lead instrument workers, a position for which ALDOT has a formal training course. The EA II/III position includes an additional qualification that the EA I position does not: EA II/III employees must be fully functional within a specialty area. The EA II/III position also involves different responsibilities than EA I: the EA II/III employees may supervise the work of a few less skilled assistants, while there is no corresponding supervisory responsibility for EA I employees.

The CE I/II and III/IV positions show similar distinctions. The duties are different: for example, CE I/II employees produce sets of roadway plans, while CE

---

a Materials Tester at the EA I level had 489.67 PAQ points, and a Materials Tester at the EA II/III level had only 474.5 points. This argument misses the mark for two reasons. First, as we have said, the PAQ points are just a starting point from which to evaluate distinctions between jobs. The fact that very few of the functional areas actually showed a 100-point differential between levels does not mean that they must be collapsed. Second, the consent decree requires that the entire classifications of EA and CE be studied and restructured. The anomalies the plaintiffs complain about are included in the averages for the EA and CE classification levels, and the averages in the classification levels are more indicative of differences between jobs in those levels than isolated examples already taken into account in calculating those averages.

III/IV employees supervise the activities of roadway plan designers. Additionally, CE III/IV employees work with utility companies and design highway facilities and other public buildings, and there is no analogue to this duty in the CE I/II description. The levels of responsibility between the positions are also distinct: CE I/II employees serve as assistant project engineers, and CE III/IV employees serve as senior project engineers and have substantial supervisory ability over other employees.

The plaintiffs also did not meet their burden of providing clear and convincing evidence that the jobs are not capable of being administered so that only persons occupying the jobs perform the duties associated with them on a regular basis. Dr. Bernard Nickels, an industrial psychologist employed by SPD, testified that he believes the proposed structure can be properly administered by ALDOT. The plaintiffs' chief argument on this issue centered on the EA I and II/III jobs and the plaintiffs' contention that those jobs are not capable of being administered under the consent decree because members of survey parties necessarily must perform as both rodmen and instrument men on occasion. However, although Dalmus Davidson, Division Engineer for ALDOT's First Division, testified that as a survey party chief he would have a problem if employees were not allowed to work out of their job classification, he also

testified that the rodman on a survey crew would not normally be allowed to use an instrument and function as an instrument man. Importantly, he also said that he would be capable of prohibiting an EA I employee from using an instrument. No reasonable factfinder could conclude from the evidence that the plaintiffs proved that the jobs are not capable of being administered under the consent decree.

In light of the entire job classification study, the testimony about the nature of the PAQ study and points, the job descriptions, and the testimony about whether the new jobs are capable of being administered under the consent decree, no reasonable factfinder could find that the plaintiffs carried their burden of showing by clear and convincing evidence that SPD's proposed classifications do not comply with Article Fifteen, ¶ 3(b) of the consent decree. The district court erred in concluding that the proposed classifications did not comply and in ordering the defendants to implement a single EA and single CE classification over the defendants' objections. As a result, we are required to vacate its February 11, 1998 order (the only one before us in this appeal) and remand the case for

further proceedings consistent with this opinion.[10]  Before doing that, we offer

some concluding thoughts.

### III.  SOME CONCLUDING THOUGHTS

Appellate courts ordinarily take cases as they come in the normal flow of

the docket and dispose of them by deciding one issue at a time.  That is as it

should be, and we have done that here.  Sometimes, with its head down, focused

on the job at hand, a court does not consider and discuss the larger problems

backlit by the dispute before it.  Like an elephant in the parlor, however, the

problems of the Reynolds litigation have become too big to ignore.

And the elephant won't go away. Since the case began there have been more

than four dozen appeals or petitions for review or mandamus filed in connection

with it.  This is the sixth appeal in which we have issued a published opinion, and

we have at least eight more separate appeals or petitions stemming from the case

---

[10]The intervenors have asked this Court, if we vacate the district court's February 11, 1998 order, to permit the defendants to prospectively implement their proposed multi-grade classifications. Prospective implementation would permit ALDOT employees currently in the combined EA and CE classifications to retain their current status and pay scale under the state merit system, while allowing the defendants to implement their study from this point forward. We think that the appropriate way in which our decision should be implemented, however, is a matter best left to the district court, with its broad discretionary power.  See Lemon v. Kurtzman, 411 U.S. 192, 200, 93 S. Ct. 1463, 1469 (1973) (citing Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 15, 27 n. 10, 91 S.Ct. 1267, 1275, 1282 n.10 (1971)).  Therefore, we decline to issue any instructions as to how SPD's classification structure should be implemented insofar as those employees who are already in the combined classifications are concerned.

that are pending before us now.  Of course, the burden on the district court, which has had to carry most of the load, has been even greater.

After eighteen years of hearing following hearing, order after order, appeal and more appeals, it is fair to ask what has been accomplished and what remains to be done.  The answer, it appears, is not enough has been accomplished and a lot remains to be done.  This unwieldy litigation has been afflicting the judicial system and draining huge amounts of public funds from the State of Alabama for much too long.  The amounts are staggering.  Fifty million dollars in public funds has been spent on attorney's fees alone in the case.[11]  An additional $62.5 million has been paid out in consultant and expert costs, bringing the total litigation costs to the State of Alabama to more than $112 million, and that cost is growing at a rate of around $500,000.00 each and every month. The figure does not even include the close to $13 million in contempt fines that the State has paid and continues to pay at the rate of $250,000.00 per month.[12] If the contempt fines are

---

[11]According to the defendants, that total breaks down as follows: $13.05 million for the defendants' attorneys; $6.24 million for the intervenors' attorneys; and $30.55 million for the plaintiffs' attorneys. Those are the figures given in the defendants' supplemental letter of March 25, 2003.  More attorney fees have been incurred since then.

[12]These figures are drawn from the defendants' supplemental filings with this Court. The figures are undisputed, except that the plaintiffs' supplemental filings say that the attorney's fees total is overstated. However, the only specifics the plaintiffs offer is their assertion that $5.5 million of that total includes an amount the defendants paid into escrow for future work by plaintiffs counsel related to payout of claims settlement amounts (discussed in the next paragraph of this footnote). Maybe so, but it is still public funds that will be paid out as attorney's fees.

included in the total, the case has cost the taxpayers of the State of Alabama $125 million so far, and the tab is increasing at the rate of $750,000.00 per month.[13]

Notwithstanding all of the public funds that have been poured into this litigation, and the judge years of effort that have gone into it, much remains to be done. There are fifteen articles of the consent decree for which contempt fines have been imposed. There has been a finding or stipulation of compliance in regard to only three of those fifteen articles. Of the remaining twelve articles, contempt fines have been suspended by agreement pending a hearing on the defendants' motion for a finding of compliance in regard to six. As to the other

---

Additionally, the plaintiffs state the total the defendants have provided for the plaintiffs' fees includes litigation support and document control work that the plaintiffs' counsel performs in-house, while the total the defendants have provided for their own counsel does not include litigation and document control work, because the defendants use separate firms for that work. However, the plaintiffs do not specify how much of the total the defendants attribute to attorney's fees is actually for litigation support and document control. And, in any event, it is still cost being paid with public funds.

[13]This $125 million cost total does not include the roughly $56.8 million the State has paid into a fund for settlement of the class members' claims ($48.45 million to the promotions class of plaintiffs and $8.35 million to the intervenors' class). If that amount is included, the cost to the State exceeds $181 million.

Although the State has paid the $56.8 million in settlement, precious little of that money has actually gone to any class members yet. As of July 1, 2003, except for eighteen members of one engineering class, none of the settling class members had received a penny in compensation. However, we have been assured that payouts to the settling class members will begin soon.

six articles, there are no pending requests for stipulation or for a finding of compliance, and contempt fines are mounting.[14]

The consent decree was originally set to expire two-and-a-half years ago on December 31, 2000. The district court extended that deadline to December 31, 2004 for certain articles and provisions, and to December 31, 2006 for others. The defendants, through their counsel in this appeal, have represented to this Court that they believe they can fulfill some of the remaining requirements of the consent decree in "perhaps one year or less," and the others "perhaps by 2005."[15] Supp. Letter of Defendants at 5, 6. When we asked the parties for supplemental letters concerning the status and cost of the Reynolds litigation, the Governor of Alabama also filed one in which he committed his administration to "quickly and fully implement[ing] a department that is race-neutral in its operation." Supp. Letter of Governor Riley at 2. We consider that an encouraging sign and expect

---

[14]The summary contained in this paragraph is drawn from information that the plaintiffs supplied which the defendants have not disputed.

[15]The defendants have not always been as committed to the fulfillment of the requirements of the consent decree as they now profess to be. In 1998, for example, the district court found a "defiant recalcitrance" on the part of ALDOT to comply with Article Fifteen, as evidenced by instructions issued by ALDOT's Assistant Director that "all efforts to implement [the new classification structure required by Article Fifteen] should be stopped at once" and that "efforts to avert this action should be pursue with fervor." The district court characterized the defendants' efforts and the Assistant Director's justification of them as "outright refusal to comply with Article XV."

38

that the Governor's commitment will be reflected in the speed with which the defendants comply with the remaining provisions of the consent decree.

The plaintiffs, through their counsel, have pledged to help bring this case to a conclusion at the earliest time, and towards that end have represented that they are "open to any reasonable modifications [to the consent decree] that will close this case at the earliest practicable opportunity."[16] Supp. Letter of Plaintiffs at 14, 15. We expect the parties to act in accordance with their representations to us, and the district court should use all lawful means to ensure that they do.

As we explained in another long-standing case involving a consent decree entered into by a governmental entity, while protecting the constitutional rights of minorities is an important duty of federal courts, woven throughout the Constitution is a commitment to democratic self-rule through officials answerable to the people. Ensley Branch, N.A.A.C.P. v. Seibels, 31 F.3d 1548, 1574-75 (11th Cir. 1994). Federal court oversight of and interference in the operations of a state government department or agency "should be as narrow and short-lived" as fulfilling the duty to eradicate discrimination allows. Id. Federal courts should

---

[16]This position is a new one for the plaintiffs who, in the past, have not been as open to modifications of the consent decree. See Reynolds v. McInnes, ___ F.3d ____ , No. 02-14228 (11th Cir. July 22, 2003) ("Reynolds VI") (affirming the district court's modification of the consent decree which was opposed by the plaintiffs).

not be in the business of running important functions of state government for decades at a time.

We can only rule on issues presented in appeals that come before us. The district court, because of the task assigned to it in our judicial system, and owing to its greater familiarity with the case, has the primary responsibility for taming this beast of a case. All reasonable and appropriate efforts to that end will be welcomed in this Court.

Beyond general encouragement, we offer two suggestions for the district court's consideration. One is that if the judicial time and effort required to bring this litigation to a proper end in a reasonably prompt manner exceeds that which the district court judge with his full regular docket can devote to the case, he may wish to consider seeking help from other judges either inside or outside his own district. Some of the issues that remain to be resolved are so interwoven that they may not be appropriate for parceling out to other judges. Others, however, may be capable of being handled by other judges. To suggest that resolution of this case may take more judicial resources than a single judge is able to devote is not to disparage the judge who has been shouldering the burden alone, but instead is merely to recognize the size of the thankless task at which the judge has resolutely labored for so long. Beyond obtaining help from other judges, the district court

40

may also wish to consider increased use of special masters where appropriate. See F.R.Civ.P. 53(b); see also Ensley Branch, 31 F.3d at 1574.

Our second suggestion has to do with attorney's fees. Under the consent decree, counsel for the plaintiff class is entitled to "reasonable fees and expenses for work done." We are informed by the defendants that class counsel for the plaintiffs is paid for every hour they spend on the case, even when they lose. And even when they lose big.[17] For example, in Reynolds II, this Court found that the attorneys for the plaintiffs had invited error by the district court and then defended the commission of that error with baseless arguments on appeal; we remanded the case with directions that the plaintiffs' attorneys be required to show cause why they should not be sanctioned under 28 U.S.C. § 1927 for unreasonably and

---

[17]The defendants' supplemental letter states: "under an agreement reached at an earlier stage of this litigation, plaintiffs' counsel are paid for every minute they spend on this case, regardless of whether they are pursuing a legitimate objection and regardless of whether they prevail." Supp. Letter of Defendants at 8. It is unclear whether the reference to "an agreement" means the consent decree or some other agreement.

If the "agreement" the defendants refer to is the consent decree, it only requires that the defendants pay "reasonable fees for expenses and work done" on behalf of the plaintiffs. While a decision about the matter will have to await proper presentation, it is not obvious to us that the language in question entitles the plaintiffs to attorney's fees for work that does not actually benefit the plaintiffs, and it is certainly not plain that the language can be construed to reward the plaintiffs' counsel for taking legal positions that clearly have no basis. If the "agreement" the defendants refer to is something outside the consent decree itself, the district court may wish to consider whether such an agreement violates public policy or is otherwise unenforceable to the extent that it fosters or encourages attorneys to pursue baseless legal positions. We note the issue without taking a position on it, because it has not been presented to us.

41

vexatiously multiplying proceedings in the case, conduct that caused substantial delay in one aspect of this case. 207 F.3d at 1301- 02. As we understand it, the plaintiffs' attorneys conceivably could be paid for their time in connection with that appeal and the proceedings which led to it even if there is a finding that their position was so baseless as to be sanctionable. That illustrates how perverse the attorney's fees incentive can be.[18]

With their fees for a particular effort not dependent upon its success, the plaintiffs' attorneys may have insufficient reason not to multiply proceedings and to contest every aspect of every part of every conceivable proceeding regardless of merit. Cf. 42 U.S.C. § 1988(b) (prevailing party status a prerequisite for compelling the defendants in certain statutory actions to pay the plaintiff's attorney fees and costs). The promise of fees for time spent without regard to the outcome of a motion or appeal in a case that apparently has endless potential for dispute may be the kerosene that has fueled the litigation fires which have raged

---

[18]Although it does not involve sanctionable conduct, the dispute before us in this appeal is another example of the plaintiffs' attorneys being paid for pursuing a position that lacks merit. These job classifications were proposed by the defendants in April of 1996. As a result of the plaintiffs' objections, implementation of the new classifications have been delayed and the ensuing litigation has gained counsel for plaintiffs hundreds of thousands, if not millions, of dollars in attorney's fees. Our decision today, which upholds the defendants' job classifications, establishes that the plaintiffs are not prevailing parties on this issue in any sense of the word, except insofar as their counsel's financial well being is concerned.

42

out of control in this case. The district court may wish to consider whether cutting down on that fuel is an appropriate way to help bring the fire under control.[19]

With these suggestions, we leave the matter in the good judgment of the district court, and will decide any related appeals as they come to us.

## IV. CONCLUSION

The February 11, 1998 order of the district court is VACATED and this case is REMANDED for further proceedings consistent with this opinion.

---

[19]Of course, the attorneys for the plaintiffs are not the only ones whose monetary self-interest will be damaged by the end of this lucrative, fee-generating case. The defendants' attorneys are also compensated for time spent and the longer the case goes on the more they will be compensated. Whether and to what extent their incentives need adjusting is something that the defendants themselves, who pay the cost of their own representation, will have to decide. The attorneys for the intervenors, however, like those for the plaintiffs, are being paid with another party's money (the defendants').